[Crim. No. 4343. In Bank.—Aug. 19, 1941.]

THE PEOPLE, Respondent, v. DEWEY CLARK et al., Appellants.

Frank G. Warren and Harold Wyatt for Appellants.

Earl Warren, Attorney General, J. Q. Brown, Deputy Attorney General, Ráymond M. Dunne, District Attorney, and Donald D. Boscoe, Deputy District Attorney, for Respondent.

CURTIS, J.—The appellants, Dewey Clark and Henry E. Jones, were found guilty by a jury of the murder of Nathan Chinchiolo and Dorothy Woofter. The verdicts carried no recommendation. Their motion for a new trial was denied. Thereupon the court pronounced its judgment and sentence that each of the defendants suffer the death penalty. They have appealed from the order denying said motion and from the judgments of conviction.

The appeal is based upon two grounds: (1) the insufficiency of the evidence to support the verdicts and judgments, as a matter of law; and (2) errors of law which were highly prejudicial to the appellants.

The appellants are negroes, and each had suffered two prior felony convictions and had served terms of imprisonment in the state prisons of this state. The appellant Jones after serving a second term of eight and one-half years, was released on April 23, 1940, just five days before the date of the crime now charged against him. Jones is forty-two years

of age, and Clark is thirty. Each is a large-sized man, Clark being six feet in height and Jones some taller. They were described by many of the witnesses as being unusually well dressed. Clark lived at Fresno with his parents and worked at odd jobs about the city. Jones on his release from the prison road camp at Keene near Bakersfield on April 24, 1940, came to Fresno, engaged a room at the Lincoln Hotel in that city and occupied the same up until his arrest, except when he was absent from the city. Jones had something like $130 on his release from prison and upon gaining his freedom, he spent it quite freely, with the result that when he was arrested, the original amount was considerably reduced. Clark and Jones became acquainted with each other while they were in prison. They also became acquainted in prison with Hubbard Turner, another member of their race, who was at that time serving a prison sentence. Turner had been released on parole some time prior to Jones' release and was living at Fresno. He lived in a small shack in Fresno, and his house became a frequent meeting-place of the two appellants and Turner.

The crimes the commission of which the defendants were accused were committed on Sunday night, April 28, 1940, in the outskirts of the city of Stockton, in the county of San Joaquin. At approximately 9:00 o'clock of that evening Nathan Chinchiolo, twenty-three years of age, and Dorothy Woofter, nineteen years of age, together with another couple, left a cocktail lounge in said city of Stockton, in a 1936 Plymouth sedan belonging to the sister of Nathan Chinchiolo. The other couple left the machine at a hotel at about 9:15 o'clock of the same evening. After telling the other couple that they would meet them at the cocktail room in one-half to three-quarters of an hour, Nathan Chinchiolo and Dorothy Woofter drove off in the Plymouth automobile, and they were never seen alive again. On Friday, May 3, 1940, their dead bodies were accidentally discovered by a farmer living at the near-by city of Manteca. The place where the bodies were found was approximately four miles south of the city of Stockton, about 100 feet from a road known as Sharp's Lane in a patch of tall grass and weeds. Tracks evidently made by an automobile led from the road to the spot where the bodies were found. The body of Nathan Chinchiolo was lying face downward, with a double gag over his mouth and eyes.

He was fully clothed. His hands were tied behind him and his feet were tied together. All the binding was done with fragments of Dorothy Woofter's clothing. There was a wound approximately two inches in length on the right side of his throat. His jugular vein had been severed. The body of Dorothy Woofter was lying some 20 feet from that of Nathan Chinchiolo. Her hands were tied behind her back. She was lying with one blanket under her and another over her. Both belonged to Nathan Chinchiolo and were kept in the car. Her throat was also cut. Doctor Fry, who performed the *post mortem* examination, when asked as to the condition of her legs, testified: ''Well, her knees were drawn up. She was laying on her back and her knees flexed at the thighs. I suppose so called sex position. . . . they resisted all efforts to straighten them down. . . . It is my opinion that those legs were placed in that position after death.''

At about 9:45 o'clock Sunday evening the couple whom Nathan Chinchiolo and Dorothy Woofter had left at the hotel on that night, returned to the cocktail room which they had previously left with Nathan Chinchiolo and Dorothy Woofter, and waited for the latter two until the regular closing time, which was 2:00 o'clock the next morning. The next morning [Monday] the Fresno police notified the Stockton police that a 1936 Plymouth sedan had been found abandoned in a vacant lot in the city of Fresno at approximately 7:00 o'clock of that morning; that the car had blood stains on the cushions of both the front and back seats, and that the glass in the right rear door was broken, with some fragments of glass in the frame of the car door.

When the families of the missing young people were informed of the finding of the abandoned Plymouth machine in Fresno, they became alarmed and a search for the missing couple was instituted, and only terminated upon the finding of the bodies, as already narrated. The next day after the bodies were found Walter Guyon, manager of a garage in the city of Tracy, which is some twenty miles from Stockton and on the road from the latter city to the city of Fresno, notified the police of Stockton that on Sunday night or Monday morning, April 29, 1940, between 12:50 and 1:00 o'clock he serviced a car meeting the description of the Plymouth machine, and he described the occupants of the car. His description of the occupants of the car led to the arrest of

the appellants, which took place the next day, Saturday, after he had given this information to the Stockton police. Upon their arrest they were brought to the city of Stockton and there questioned regarding the murder of the two people whose dead bodies were found a few days before. Each of the appellants denied that he was guilty of the murder of either Nathan Chinchiolo or Dorothy Woofter, and each denied that he was in the city of Stockton on Sunday, the day of the murder, or at any other time near that date. The appellant Clark stated to the officers that he and Jones between 5:00 and 7:00 Saturday evening left Fresno for Bakersfield, and from there they went to a prison road camp at Keene, some thirty miles distant from Bakersfield, where they hoped to sell some wine to the prisoners at that camp. Failing to do so, they returned to Fresno, arriving there about 1:00 o'clock Monday morning. Jones, on the other hand, when questioned by the officers, told them that he did not go to Bakersfield, but remained in Fresno all day Saturday, Sunday and Monday. He denied any knowledge of the murder of either of the two people charged in the indictments. Each of the two appellants denied any knowledge of the Plymouth sedan found abandoned the Monday before in a vacant lot in Fresno. [0]

At the trial the prosecution proved by positive and direct evidence that the two appellants did leave Fresno on Saturday, April 27, 1940, and that they arrived in Stockton the next Sunday morning; that they registered at the White Hotel in that city under fictitious names; that Jones purchased a watch and chain while in Stockton. There was evidence tending to show that on Sunday evening just before dark the two appellants were on East Clay Street near a spot referred to in the evidence as "lover's lane," where, according to the theory of the prosecution, the appellants first accosted Nathan Chinchiolo and Dorothy Woofter, overpowered them and drove them to the spot where their dead bodies were found. There was also evidence introduced the effect of which was to show that the two appellants were seen near the spot where the bodies were found some time before 10:00 o'clock on the night of the murder. The prosecution produced most convincing evidence that on the night of the murder the two appellants left Stockton in the Plymouth sedan and arrived at Fresno the next morning in this machine.

We have already mentioned the testimony of Walter Guyon, the manager of the garage at Tracy. He testified most positively as to the identity of the Plymouth sedan and also as to the identity of the appellants as the men who were in possession of the machine. According to his testimony, the appellants, when they stopped at his garage, had the tail light of the car repaired and they purchased eight gallons of gasoline. He also noted the broken glass in the right rear door of the machine and called it to the attention of the appellants. His reference to the broken glass in the door brought forth a remark from appellant Jones that they had a "drunken gal" in the car earlier in the evening and she "kicked it out." The testimony of this witness shows that each of the appellants got out of the car while it was in the garage at Tracy, and that the witness had a good opportunity to observe their appearance, their size and their clothes. He positively identified them as the two persons then on trial before the court.

The next place at which the appellants were purported to have been seen was Newman, some thirty-eight miles south of Tracy and between Tracy and Fresno. Richard C. Kinman, the keeper of a bar at Newman, testified that between midnight and 2:00 o'clock Monday morning, April 29, a man came into his place of business, whom he identified as the appellant Clark, and bought some cigarettes. He went out and came back and bought a bottle of beer, which he drank. Just as he was leaving another negro came just inside the door and asked how far it was to Los Banos, and the witness told him that it was twenty-three miles. The witness did not identify this second man as Jones, but stated that he was a tall negro and was dressed in dark clothing, and that he particularly remembered the occasion and the time for they were the first negroes who had been in his place of business for over a year. The two men left his place together.

At Los Banos, which is twenty-three miles further south on the way to Fresno, two men came into the restaurant conducted by Mr. and Mrs. Ernest Houser, and one asked for coffee and doughnuts for the two. They sat down at a table, Mrs. Houser served them with the order, and then they left. Both Mr. and Mrs. Houser identified them as the two appellants, and the one who did the talking and placed the order, as Jones. Mrs. Emily Vierra, a friend of the Housers, was waiting at the restaurant for her husband [a milk truck

hauler], and she saw and identified the men entering the restaurant at that time as the appellants. These three witnesses placed the time at which the appellants reached the restaurant as early Monday morning, April 29.

Other important matters were brought out by the prosecution linking the appellants with the commission of the crimes, some of which will be referred to later in the discussion of various questions raised by the parties.

After the prosecution had rested, each of the appellants took the witness stand and testified in behalf of himself and his co-defendant. Each admitted that he had made false statements to the officers as to his whereabouts on Saturday, Sunday and Monday, April 27, 28 and 29. They further admitted that they did leave Fresno on the afternoon of April 27 and arrived in Stockton the next morning [Sunday]; that they were in Stockton all day Sunday, but returned to Fresno, leaving Stockton on Sunday night on a freight train and arriving in Fresno Monday morning. They denied, however, that they had committed either of the murders charged against them or knew anything about either of said crimes, or knew either Nathan Chinchiolo or Dorothy Woofter. They further denied any knowledge of the 1936 Plymouth sedan in which the two deceased were last seen alive. They denied making the trip back to Fresno by automobile and flatly contradicted the witnesses who testified that they saw and identified them at Tracy, Newman and Los Banos.

The foregoing serves as a brief statement of the evidence in the case. The record before us consists of over 2500 typewritten pages of evidence, which has been read in its entirety, but a mere skeleton statement thereof would unduly extend this opinion and would serve no useful purpose.

▇ Whether the evidence against the appellants was sufficient to justify the verdicts of the jury finding them guilty of the crimes charged was, of course, primarily for the jury. The only question before a court reviewing the verdict of the jury upon a contention as to the insufficiency of the evidence, is whether there is any substantial evidence to support the result reached by the jury. If evidence of that character was before the jury, then the duty of the appellate court ends and there is but one action for it to take, and that is to sustain the verdict. In reviewing the evidence in this case, we are not only of the opinion that the record furnishes sufficient

substantial evidence to support the verdicts of the jury, as it affects each of the appellants, but we cannot perceive upon what possible hypothesis any other different verdicts could have been rendered. Upon positive uncontrovertible evidence, the appellants were found a few hours after the disappearance of the murdered couple, in the possession of the Plymouth sedan in which the latter were last seen alive. Mr. Guyon, the manager of the garage at Tracy, positively identified the machine and also the appellants. Evidently it was the information given by Mr. Guyon which led to the arrest of the appellants. It was his description of them which enabled the officers at Fresno to pick out the appellants from among all the negroes of that city, as the two men who were at his garage on that Monday morning. His evidence was corroborated by the testimony of the witnesses who saw the appellants at Newman and Los Banos the same morning. While the appellants denied that they made the trip from Stockton to Fresno by automobile, as the evidence thus would indicate they did, their denial is uncorroborated, and the many contradictions in their evidence and the many admittedly false statements made by them before the trial when accused of these crimes, furnish ample justification for the rejection of their evidence by the jury. With this record before us we are not only bound by the verdicts of the jury, but we are in entire accord with the conclusion reached by it.

Appellants recognize and concede the applicability and controlling effect of the rule in criminal, as well as in civil, actions that the verdict of the jury must be sustained by a reviewing court if there is any substantial evidence in the record supporting its conclusion. However, they contend that in many instances the evidence produced by the prosecution was so inherently improbable as to be unworthy of belief, and that the jury's action in rendering verdicts of guilty against them based upon such evidence was arbitrary and should not be permitted to stand.

The testimony of the witnesses which the appellants particularly assail as being so inherently improbable as to be unworthy of belief is that of the two railroad men E. B. Lyman and C. I. Green, and Mr. and Mrs. Dimock. The two former testified that they saw the appellants on the evening of the murder some time before dark, at a place near the foot of Clay Street, which, it will be remembered, is near the spot referred to by the witnesses as "lover's lane," and where,

under the theory of the prosecution, the appellants first attacked the deceased couple, kidnapped them and drove them to the place where their bodies were found, some 200 feet from Sharp's Lane. Mr. and Mrs. Dimock testified that at a little before 10:00 o'clock of the Sunday evening in question they were driving along Sharp's Lane near where the bodies were later found, and they met the two appellants. Appellants argue that the slight opportunity these witnesses had to observe them and the brief time they testified that the appellants were in their view rendered it impossible for them to give any reliable testimony as to the identity of the appellants. While we agree with the appellants that the opportunity of these witnesses to observe the appellants was extremely limited, especially that of Mr. and Mrs. Dimock, we cannot agree with them that their testimony given under such limitations was so lacking in evidentiary value as to render it inherently improbable, and that it should have been rejected by the jury. As stated before, each of the appellants is a large man, Clark being six feet in height and Jones slightly taller. They were well dressed and Jones had a peculiarity in his walk, which was quite marked. These characteristics were noticed by the witnesses and were given by them as some of their reasons why they were able to identify appellants.

Appellants claim that these four witnesses are the only ones whose evidence even tended to place the appellants in the vicinity of the place where the crime was committed, and if their evidence is rejected, then the whole case of the prosecution must fail. We do not agree with this statement. Independent of the testimony of these four witnesses, the record in our opinion contains sufficient evidence to support the verdicts of the jury. The fact that appellants were found in possession of the Plymouth sedan in which the two deceased were last seen, only a few hours after the murder, and that no explanation was offered by them as to why or how they came into its possession, taken with the many false statements and contradictions in appellants' testimony, is sufficient to justify the verdicts of the jury finding appellants guilty of the crime charged against them.

There is a link in the evidence not heretofore mentioned which supports the prosecution's theory that the two deceased were first assaulted near the foot of Clay Street, overpowered and driven to a point near Sharp's Lane, where they were

murdered. The broken glass noticed by Mr. Guyon in the right rear door of the Plymouth sedan was badly shattered, but there were a number of fragments still to be found in the door frame. There were also found fragments of broken glass at the end of Clay Street near where the appellants were seen by the two railroad men, and fragments of broken glass were also found in the immediate vicinity where the dead bodies were discovered. The pieces of broken glass found at each of these two places were collected and with those remaining in the frame of the rear door of the Plymouth sedan and also some in the car itself, were put together somewhat in the same manner as a jig-saw puzzle is worked, with the result that a large part of the original pane of glass was restored, showing that the pieces of glass found at the foot of Clay Street, those found in Sharp's Lane in the vicinity where the bodies of the two young people were found, and those left in the frame of the broken rear door of the machine formed at one time one complete pane of glass.

Another link in the evidence which might have appealed strongly to the jury and not heretofore mentioned was that there were spots of blood on the clothing worn by appellants on their trip to Stockton. This evidence was given by experts, who examined the clothing after the arrest of appellants. This evidence is in a way corroborated by the testimony of Hubbard Turner, the negro with whom the appellants associated in Fresno. He testified that early Monday morning, the day the appellants returned to Fresno from Stockton, the two appellants came to his house and asked for cleaning fluid, which he gave them, and it was used by them in cleaning their clothing. Clark endeavored to explain his use of the cleaning fluid by stating that he had some black substance resembling tar on his pantaloons and was using the cleaning fluid to remove it. He also attempted to account for any blood on his clothing by the fact that he bought and killed a chicken, and possibly some blood from it got on to his clothing. Jones stated that he was troubled with piles, and that the blood on his clothing was due to their presence. However, he was examined by a doctor after his arrest, who testified that he was not so afflicted and there was no indication that he ever had been troubled with that affliction.

There was also some evidence that the appellants and Turner were planning a robbery of a lady in San Luis Obispo and needed a machine to carry out their plan; that they had

tried to steal one but failed in their purpose. The same witness Turner who testified to the last-mentioned incidents, further testified that Monday afternoon, the day of the appellants' return from Stockton, the two appellants took Turner out where the Plymouth sedan had been left on the vacant lot and told him that that was the machine they had secured. Taylor McMurray, a disinterested witness, also testified to seeing the appellant Clark and two other negroes, one quite large, walking along the road in the same vicinity. The witness Turner also testified that Jones gave him a flashlight some time Monday. It was proven that this flashlight was in the Chinchiolo machine on Sunday evening, the night of the murders.

Two other matters should be briefly referred to as having some bearing upon the case, one of which is of but slight importance, but the other, according to the evidence, appeared for a short time at least, to be of considerable materiality. The first of these is the trip of Jones to Big Creek to visit a white woman residing there, and who was called as a witness by the prosecution. . Appellant Jones testified that he was to meet this woman in Stockton, and that he went to Stockton for that purpose on Saturday, April 27. From the evidence brought out, particularly on cross-examination, it was proved that Jones did write her a letter to meet him at the White Hotel at Stockton, and sent her $10, ostensibly for the purpose of paying her expenses. This letter was not dated, but it was postmarked Fresno, April 26, 1940, 8:30 p. m., which was Friday. Big Creek is sixty-nine miles from Fresno. As the letter was evidently mailed Friday evening, it is evident that it might have been received by the woman in time for her to meet Jones in Stockton on Sunday. On receipt of this letter, however, the witness wrote Jones to come up and see her Monday. Jones evidently received this letter on Monday or Tuesday, after his return from Stockton. In response thereto Jones went to Big Creek Tuesday and spent two days with her, returning to Fresno on Thursday. This witness testified that Jones remained in her house the entire time he was at Big Creek and requested that the window shades be kept down. The testimony of this witness is of but slight materiality, except that it might show that one purpose Jones had in going to Stockton was to meet this woman.

The other matter just referred to is the purported confession of Ernest Striplin. At the date Nathan Chinchiolo and Dor-

othy Woofter were alleged to have been murdered, one Ernest Striplin was residing in Stockton, but shortly thereafter he was convicted of a felony and sent to Folsom State Prison. While in prison and in July, 1940, Striplin made a purported confession, in which he stated that he killed Nathan Chinchiolo and Dorothy Woofter. He was brought back to Stockton by the officers for the purpose of testing his story. He took the officers, or he was taken by them, to the scene of the crime and to other places in Stockton mentioned by the witnesses for the prosecution. The officers were apparently impressed with the truth of his story. However, after his return to Folsom, he repudiated the whole of his purported confession and stated that he only told the story for the purpose of being brought back to Stockton, in the hope that he might be able to escape from the officers on the way to or from prison. He was a witness at the trial, produced by the appellants, and he denied any connection with, or knowledge of, the murder of either Nathan Chinchiolo or Dorothy Woofter. He told where he was on the night the murders were committed, and his testimony was corroborated by his friends, acquaintances and members of his family. In fact he proved a complete alibi. His evidence was for the consideration of the jury, and they evidently believed his purported confession was false in its entirety.

Reviewing the evidence against the appellants as we have in the foregoing pages of this opinion, we find ourselves unable to agree with their contention that it is either insufficient to support the verdicts or that any material parts thereof are so inherently improbable as to be legally insufficient for the consideration of the jury in determining the guilt of the appellants. Therefore, the contention of the appellants as to the insufficiency of the evidence is without merit.

The sole error of law assigned by appellants as occurring during their trial was the action of the court in ordering them to rise in order to be identified by witnesses testifying as to their identity, and in directing appellant Jones to remove the visor he was wearing in court, so that the witnesses attempting to identify him might have an unobstructed view of his features. Practically the same state of facts was before this court in the case of *People* v. *Goldenson,* 76 Cal. 328, 347 [19 Pac. 161], and *People* v. *Oliveria,* 127 Cal. 376, 380 [59 Pac. 772], and before the District Court of Appeal in the case of *People* v. *Ferns,* 27 Cal. App. 285, 287 [149 Pac. 802], in

which it was held that such an order of the court was not error nor a violation of the constitutional rights of a defendant not to be a witness against himself. In *People* v. *Cornell*, 203 Cal. 144, 147 [263 Pac. 216], in commenting upon the case of *People* v. *Goldenson, supra,* we find it stated: " . . . this court aptly observing that the defendant was not thereby 'compelled to exhibit any part of his person which the jurors could not see as he walked in and out every day.' " Nor was it error for the trial court to order Jones to stand and remove a visor he was wearing in court. It has been held that an order of the trial court directed to a defendant to stand up and remove his glasses was not error. (22 C. J. S. 999; *Rutherford* v. *State,* 135 Tex. Cr. 530 [121 S. W. (2d) 342].) Appellants rely upon language contained in the opinion of *People* v. *Mayen,* 188 Cal. 237, 253 [205 Pac. 435, 24 A. L. R. 1383], stating that one accused of crime has the right at all stages "to stand silent and *inert* before his accusers." [Emphasis ours.] The question involved in that case was whether property of the accused, unlawfully seized by the officers, could be introduced in evidence against the owner. The above language upon which appellants rely was not necessary for the decision of any question before the court in that case, and for that reason may not be regarded as binding upon the court in any future action where the point is directly involved. Furthermore, this language relied upon is found in a general discussion of a collateral matter, and we are convinced that by its use the court did not intend to overrule its prior decisions, where it directly held to the contrary.

Our conclusion, therefore, is that the order denying the appellants' motion for a new trial and the judgments against them should be affirmed, and it is so ordered.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., and Traynor, J., concurred.