[Crim. No. 4845.   In Bank.   June 15, 1948.]

THE PEOPLE, Respondent, v. JOSEPH TRUJILLO et al.,
Appellants.

Gerald J. Kenny, Public Defender, William L. Ferdon, Deputy Public Defender, and Jos. G. Gallagher for Appellants.

Fred N. Howser, Attorney General, and Miriam E. Wolff, Deputy Attorney General, for Respondent.

EDMONDS, J.—Joseph Trujillo and Ernest Woodmansee were indicted for the murder of Charles Odom. Trujillo was found guilty of murder in the first degree without recommendation and sentenced to death. Woodmansee was convicted of murder in the first degree, with the recommendation that he be confined to the state prison for life.

The body of Charles Odom, a special police officer in San Francisco, was found shortly after 5 a. m. on the morning of September 10, 1946, at Dan's Creamery. The body was slumped on the ground, with a scarf around the neck. A hammer, screw driver, ripping bar, flashlight, pliers, cold chisel, small cold chisel, drift pin and a pair of gloves were scattered near by.

Evidence presented at the trial shows that Odom was shot through the heart, and suffered severe lacerations of the head and face. His gun, fully loaded, was found in his holster. The outside door of the premises had been opened, and one of the interior doorways forced. An effort had been made to break through another door inside of the building.

Woodmansee was 18 and Trujillo about 28 years of age at the time the crime was committed. Foakes, an accomplice and the youngest of the three, was promised immunity if he would testify against the other two. He told the jury that he escaped from the San Francisco Juvenile Detention Home on September 8th. About 9 p. m. that evening, he went to a poolroom where he found Trujillo and Woodmansee. After discussing his escape from the detention home, he informed Trujillo that he had no money, and asked if he had a "job lined up" for that night. Trujillo told him that he did not, but that they were going to "pull a job" the following night. Foakes made arrangements to meet them at the pool hall the next night, and asked if they wanted him to steal a car. Trujillo stated that "everything was taken care of" and Foakes need not get a car.

The next night, Foakes returned to the poolroom and found Trujillo playing the pinball machines. Later Trujillo and

Foakes went to Wong's Cafe, where they met Woodmansee. They drove to the cafe in a coupe. The three boys had some pie and coffee and after they left Wong's at Foakes' suggestion, they bought four marihuana cigarettes for $1.00 each. Their next stop was a place in Golden Gate Park known to them as "the hide-out," where they parked the car and smoked the cigarettes.

When the cigarettes were smoked, with Trujillo driving the car, they went to the corner on which Dan's Creamery was located. At the corner, the car was parked in a manner to command the view of the streets intersecting at that point. Foakes was instructed to stay in the car, be the "look-out," and have the car ready to get away whenever it was necessary. He was also told to warn the other two by a whistle if he saw any danger.

Trujillo and Woodmansee got out of the car and walked across the street in the direction of the rear of Dan's Creamery. Foakes testified that he was dizzy from the cigarettes and, after the other two had gone, he put his head down on the steering wheel. Soon Woodmansee came back to the car and said that "Joe was doing O.K. over there." Woodmansee then "went back over there." Foakes heard a noise like a shot, and a few seconds later Trujillo and Woodmansee ran back to the car, and threw something, which sounded like tools, in the rear. Foakes drove them away in the car and, as he did so, Woodmansee and Trujillo were yelling at each other that "they shouldn't have done this and that." Trujillo and Woodmansee cursed him for his failure to keep a lookout and give them the signal.

About a week later, Foakes had a conversation with Trujillo, asking him "what he did it for." Trujillo replied that they did not know it was an officer and "they just lost their head." By other testimony of Foakes, he identified a gun introduced in evidence as "looking like" the gun which Trujillo had shown him at the hide-out in Golden Gate Park the night of the homicide. He also said that the scarf which was around the neck of Odom was one which he had seen on a trunk in Trujillo's room, and the gloves found near the body were the ones worn by Trujillo when Odom was killed

The gun was identified by the owner of the 718 Club as one stolen from him when it was burglarized about a month before the homicide. Trujillo and Woodmansee both admitted burglarizing the 718 Club and taking the gun, some change amount-

ing to between \$30 and \$50, and two bottles of whiskey. A screw driver and jimmy bar were used by them in committing that crime, but both of them denied that the screw driver found near the body of Odom had ever been in their possession. They stated it was not one of the tools used by them in the 718 Club burglary. A jimmy bar, admitted in evidence, was found in a coupe which Trujillo admitted he had stolen from a garage.

Moulage casts had been made by the police of the door which was forced to obtain entrance to the 718 Club. The jimmy bar closely fitted the cast, and the screw driver found near Odom's body also was the same size as certain marks in it.

The gun was found by the police under a radio in the home of Dorothy Corder. She testified that she was in the tavern the night Trujillo was arrested. She left the tavern immediately after his arrest, went to his room and took the gun which she found underneath the carpet beside a trunk. The police officers and Trujillo arrived just as she was leaving the house with the gun. When she got home, she filed the inside of the barrel of the gun with a rat-tailed file.

A ballistics expert testified that he had examined the gun and also the bullet which killed Odom. He described the gun as being in poor condition. No definite determination could be made, he explained, that the bullet in evidence had been fired from that gun ''because the bullet did not fit tightly into the barrel . . . [and] the bullet had undergone a certain amount of mutilation after having been fired. . . .'' The effect of his testimony was that the bullet could have come from that gun because it had five lands and five grooves, and the rifling of the bullet indicated it was fired from one having such characteristics.

Clothing belonging to Trujillo was subjected to a test by an expert for the purpose of matching fibers with those found on the scarf and other pieces of apparel from Odom's body. Eleven different sets of matching fibers were found, many of which were duplicated with multiple fibers. Dr. Kirk testified that the chances were one in a hundred billion that this number of matches would be a coincidence; therefore, he concluded, these articles had come in contact with one another.

The gun was identified by four witnesses, other than Foakes and the defendants, as having been in Trujillo's possession; the scarf was recognized and identified by two witnesses other than Foakes as having been on Trujillo's trunk, and the screw driver was recognized by one witness, other than Foakes, as

having been in Trujillo's possession previous to the night of the crime.

Before the grand jury, Foakes testified as a disinterested witness, but he did not admit participation in the crime. His testimony then included none of the events of the evening of the homicide and was limited to the plans to break into the creamery. According to that testimony, he had been in on these plans but he did not show up at the prearranged time and go with the other defendants.

As witnesses in their own behalf, both defendants denied having had anything to do with Odom's death although they admitted that the gun in evidence was stolen by them when they burglarized the 718 Club. The hammer found near the body of Odom was marked with the initials "E. W." but Woodmansee denied ownership of it. After his arrest in the state of Virginia, Woodmansee sent his mother a telegram requesting her to retain an attorney and also to "get in touch with Joe."

Woodmansee argues that the indictment found by the grand jury was void, as the only testimony before it was illegal and the superior court was without jurisdiction to try the charge. As to the evidence presented at the trial, it was prejudicial error, says Woodmansee, to admit the gun and the articles found at the place of the crime. His contention is that there is nothing in the record to connect him with them.

The defendants join in contending that the evidence is legally insufficient to sustain the verdicts of guilty because there is no corroboration of the testimony of Foakes, who was the only witness to testify to any of the essentials of the crime. They take the position that as Foakes was an accomplice, his testimony, without corroboration, is not sufficient to sustain the conviction.

Trujillo complains of the testimony of the expert who testified in regard to the matching of fibers after an examination of his clothing. He asserts that such testimony was inadmissible because it compelled him to testify against himself in violation of the provisions of the state and federal Constitutions.

■ Lack of corroborative evidence of the testimony of the accomplice is the main question raised by both defendants. Foakes was an admitted accomplice and his testimony requires corroboration which tends to connect the defendants with the crime. (Pen. Code, § 1111.) Such corroboration must create more than a suspicion of guilt, but is sufficient even though it

"be slight and, when standing by itself, entitled to but little consideration." (*People* v. *Negra,* 208 Cal. 64, 69 [280 P. 354] ; *People* v. *Wilson,* 25 Cal.2d 341, 347 [153 P.2d 720] ; *People* v. *Shaw,* 17 Cal.2d 778, 803 [112 P.2d 241] ; *People* v. *Yeager,* 194 Cal. 452, 473 [229 P. 40].) It is sufficient when the evidence offered as corroborative tends to connect a defendant with the commission of the crime in such a way as reasonably may satisfy a jury that the accomplice is telling the truth. ■ It is not necessary that the accomplice be corroborated as to every fact to which he testifies. If his testimony could be completely proven by other evidence, there would be no occasion to offer him as a witness. (*People* v. *Negra, supra;* *People* v. *Yeager, supra.*) For the same reason, it is not necessary that the independent evidence be sufficient to establish the defendant's guilt. The prosecution is not required to single out an isolated fact which in itself, unrelated to other proven facts, is considered to be sufficient corroboration. It is the combined and cumulative weight of the evidence furnished by nonaccomplice witnesses which supplies the test.

■ The testimony of Foakes supplies the details of the crime. But, aside from his testimony, the State introduced evidence tending to show that the bullet which killed Odom could have come from the gun which was admitted by Trujillo to have been in his possession prior to the crime and which, after his arrest, was taken from his room by Dorothy Corder. The scarf found at the scene of the crime was recognized and identified by two witnesses, other than Foakes, as having been on the trunk in Trujillo's room. The fiber matching test on Trujillo's clothing tends to prove that his clothing had come in contact with pieces of apparel from Odom's body. Also, there is substantial evidence to support the conclusion that the screw driver found near the body of Odom was the one used by Trujillo and Woodmansee when they burglarized the 718 Club.

Another link in the chain of evidence is that the hammer found beside the body of Odom bore the initials "E. W." The telegram which Woodmansee sent to his mother upon his arrest requesting her to get in touch with "Joe" is an additional fact which is entitled to consideration in connection with the question of corroboration. Although these particular bits of evidence, standing alone, might be entitled to but little consideration, all of it, taken together and considered in connection with the other evidence, is sufficient to connect each of the defend-

ants with the crime. ▮ The weight of the corroborative evidence, as well as that of the accomplice, is a question for the jury to determine. (*People* v. *Barker,* 114 Cal. 617, 620 [46 P. 601].)

▮ The only other question presented by Trujillo concerns the admissibility in evidence of his clothing and the testimony in regard to the matching fibers. He asserts that this evidence was inadmissible and violative of the constitutional prohibition against self-incrimination. No contention is made that the clothing was obtained other than by legal process; the appellant complains that it was taken 10 months after the crime was committed, that there was nothing to link it to the crime, and no consent to the examination was given by Trujillo.

Article I, section 13, of the Constitution of the State of California provides in part: ''. . . No person shall be . . . compelled, in any criminal case, to be a witness against himself. . . .'' Wigmore, in an exhaustive and scholarly discussion of the history and policy behind the provision of the federal Constitution, which is substantially the same as the California mandate, concludes that the object of the protection ''is the employment of legal process to *extract from the person's own lips* an admission of his guilt, which will thus take the place of other evidence . . . it exists mainly in order to stimulate the prosecution to a full and fair search for evidence procurable by their own exertions, and to deter them from a lazy and pernicious reliance upon the accused's testimony extracted by force of law.

''Such, finally, is the practical requirement that follows from the necessity of recognizing other unquestioned methods of procuring evidence; for if the privilege extended beyond these limits, and protected an accused otherwise than in his strictly testimonial status,—if, in other words, it created inviolability not only for his physical control in whatever form exercised, then it would be possible for a guilty person to shut himself up in his house, with all the tools and indicia of his crime, and defy the authority of the law to employ in evidence anything that might be obtained by forcible overthrowing his possession and compelling the surrender of the evidential articles,—a clear '*reductio ad absurdum.*'

''In other words, it is not merely any and every compulsion that is the kernel of the privilege, in history and in the constitutional definitions, but *testimonial compulsion.*'' (8 Wigmore, Evidence § 2263, p. 363.)

But preservation of the constitutional privilege does not require extension of its protection to the extent now urged by Trujillo. He attempts to show that the rule of law applied in the cases in which evidence was held to be admissible with reference to fingerprints (*People* v. *Jones*, 112 Cal.App. 68 [296 P. 317]), handwriting (*People* v. *Gormley*, 64 Cal.App. 2d 336 [148 P.2d 687]), physical examinations (*People* v. *Bundy*, 168 Cal. 777 [145 P. 537]; *People* v. *Salas*, 17 Cal. App.2d 75 [61 P.2d 771]; and *People* v. *Guiterez*, 126 Cal. App. 526 [14 P.2d 838]), and the identification of the defendant in the courtroom (*People* v. *Clark*, 18 Cal.2d 449 [116 P.2d 56]; *People* v. *Oliveria*, 127 Cal. 376 [59 P. 772]; *People* v. *Goldenson*, 76 Cal. 328 [19 P. 161]), is not controlling in regard to the evidence presented against him.

In each of these cases, the doctrine of self-incrimination was limited to testimonial compulsion, and there is no legal reason for a further extension of it. In the words of Mr. Wigmore: "If an accused person were to refuse to be removed from the jail to the court-room for trial, claiming that he was privileged not to expose his features to the witnesses for identification, it is not difficult to conceive the judicial reception which would be given to such a claim. And yet no less a claim is the logical consequence of the argument that has been frequently offered and occasionally sanctioned in applying the privilege to proof of the bodily features of the accused." (8 Wigmore, Evidence (3d ed.) § 2265, p. 374.)

The evidence challenged by Trujillo falls within the classification of that which relates to physical identification. As was said in *People* v. *One 1941 Mercury Sedan*, 74 Cal.App. 2d 199, 206 [168 P.2d 443], "the mere fact that the evidence, other than testimonial evidence, had its origin with defendant, even where taken against his will, is no ground for its exclusion." If Trujillo's theory were the rule, all chattels, including his gun, or anything found on his person at the time of his arrest, would be subject to objection. It would be difficult to convict one who had committed a crime if, upon his objection, all physical evidence connecting him with the crime would be inadmissible. The remoteness of time between the date the clothing was obtained and its examination by the expert relates solely to the weight of the evidence, and the defendant's objection to it upon that ground was properly overruled. (*People* v. *Nakis*, 184 Cal. 105 [193 P. 92]; *People* v. *Planagan*, 65 Cal.App.2d 371 [150 P.2d 927].)

Woodmansee has presented other questions for decision. First, he claims that the indictment returned against him was void, and consequently the superior court had no jurisdiction to try him. The ground for his position is that the testimony presented to the grand jury was hearsay and incompetent and did not amount to legal evidence connecting him with the crime charged. He relies upon that portion of section 919 of the Penal Code which provides: ''The grand jury can receive none but legal evidence and the best evidence in degree, to the exclusion of hearsay or secondary evidence.''

It is true that, at the time of the hearing before the grand jury, Foakes had not admitted his complicity and appeared as a disinterested witness, testifying to facts different from those related by him at the trial. But his testimony at the grand jury hearing was not hearsay as to Woodmansee. He testified that Woodmansee was present during a conversation between himself and Trujillo at which time he was told that Trujillo and Woodmansee had a ''job lined up'' for the following evening. As Foakes related the incident, Woodmansee took no part in the conversation; ''he just sat there.'' This testimony was clearly admissible under section 1870 of the Code of Civil Procedure, which provides that ''. . . evidence may be given upon a trial of the following facts: . . . 3. An act or declaration of another, in the presence and within the observation of a party, and his conduct in relation thereto; . . . . ''

Generally this provision of the statute is applied in the case of inculpatory statements made in the presence of an accused and not denied or contradicted by him, and the statements ''are admissible only when they are offered in connection with evidence of statements or conduct of the accused, tending to give credibility to the accusation.'' (*People* v. *Allen*, 138 Cal.App. 652, 656 [33 P.2d 77]; *People* v. *Petersen*, 66 Cal.App.2d 420 [152 P.2d 347].) However, the same reasoning leads to the conclusion that the evidence here challenged was properly admitted. The statement of the witness is not direct evidence, but is admissible in connection with the conduct of Woodmansee for the purpose of showing his reaction to the statements, and that his conduct was such as to implicate him in the commission of the crime with which he is charged. (*People* v. *Lew Fat*, 189 Cal. 242 [207 P. 881]; *People* v. *Wade*, 71 Cal.App.2d 646 [163 P.2d 59]; *People* v. *Peete*, 54 Cal.App. 333 [202 P. 51]; 8 Cal.Jur. 101.) As such

it is "legal evidence" within the meaning of section 919 of the Penal Code.

In addition to Foakes' statement as to the conversation which he had with Trujillo, the hammer bearing the initials "E. W." was introduced in evidence before the grand jury. It is true that no one identified the hammer as belonging to Woodmansee, but the fact that it bore his initials is circumstantial evidence of ownership which the grand jury was entitled to consider. (Code Civ. Proc., § 1954; cf., *People* v. *Adamson*, 27 Cal.2d 478, 485 [165 P.2d 3]; and cases cited therein.) Assuming, without deciding, that the question of the sufficiency of the evidence before the grand jury may be reviewed upon appeal (cf., *Greenberg* v. *Superior Court*, 19 Cal.2d 319 [121 P.2d 713]), it follows that the finding of the indictment of the grand jury was based upon sufficient evidence to connect Woodmansee with the crime, and was not subject to a motion to set it aside. (Pen. Code, § 995.)

Finally, Woodmansee complains of the admission in evidence of certain exhibits in the case against him. These exhibits consist of the articles found near Odom's body. All of them are admissible in evidence upon a prima facie showing of a connection with the crime committed. (*People* v. *Miller*, 177 Cal. 404 [170 P. 817]; 8 Cal.Jur. 143 and cases there cited.) Each of them tends to prove the manner in which the crime was committed. (*People* v. *Peete, supra.*) "As a general rule physical objects which constitute a part of the transaction, or which serve to unfold or explain it, may be exhibited in evidence, if properly identified, whenever the transaction is under judicial investigation." (*People* v. *Green*, 13 Cal.2d 37, 43 [87 P.2d 821], quoting with approval from *People* v. *Bannon*, 59 Cal.App. 50, 56 [209 P. 1029].)

The gun was also admissible as evidence connecting the defendants with the commission of the offense charged. (8 Cal.Jur. 145, and cases cited therein.) It was found in Trujillo's room and identified by witnesses other than Foakes as having been in his possession. Moreover, both Trujillo and Woodmansee admitted that they had stolen it from the 718 Club. The purpose of presenting the crowbar to the jury was to show the burglary of the tavern, whose owner testified that it was taken at that time and the evidence was clearly relevant for the purpose of identification.

The testimony of the accomplice Foakes placed Woodmansee at the scene of the crime, and, regardless of who

had possession of the instruments and tools prior to and after the commission of the crime, the exhibits were admissible as against each of the parties who were otherwise shown to have been connected with the crime. Merely because his connection with the crime was proved by accomplice testimony, it does not follow that evidence, which would be admissible had his connection been proved in some other fashion, is inadmissible. (Cf., *People* v. *Santos,* 134 Cal.App. 736, 746 [26 P.2d 522].) Evidence which has probative value may be admitted. The weight to be given such evidence is a question for the jury to determine. (*People* v. *Adamson, supra,* p. 485.)

The judgments and the orders denying the motions for a new trial are affirmed.

Gibson, C. J., Shenk, J., Traynor, J., and Spence, J., concurred.

CARTER, J.—I concur in the judgment of affirmance as to defendant Trujillo, but I dissent from that portion of the majority opinion which holds that the evidence is sufficient to support the judgment against defendant Woodmansee.

In my opinion there was insufficient corroboration of Foakes' testimony to connect defendant Woodmansee with the crime, and that the judgment as to this defendant should be reversed. The only evidence of that character consists of the presence at the scene of the crime of a hammer upon which appears in stamped letters the initials E. W. (the same as those of Woodmansee) ; that Woodmansee and defendant Trujillo were seen together before and after the crime and had jointly committed a previous burglary; that a screw driver found at the scene of the crime was similar to one used in the previous burglary and the telegram sent by Woodmansee to his mother when he was arrested asked her to retain counsel and contact ''Joe'' meaning Joe Trujillo.

Even conceding that there was sufficient evidence at the trial (which I do not), there was a total absence of evidence to support the indictment against Woodmansee. The sole evidence concerning his connection with the crime is (1), the presence of the hammer at the scene of the crime with letters stamped thereon which corresponded to his initials, and (2), his presence and maintenance of silence at a conversation between Foakes and Trujillo in which the latter told Foakes he and Woodmansee would probably do a ''job'' the next night. It needs no discussion to demonstrate the total inadequacy of the

first item of evidence. There was no evidence that the hammer belonged to Woodmansee, or that he had ever had it in his possession. Certainly the mere presence at the scene of a crime of an article with letters stamped on it that correspond to some person's initials completely fails to connect him with the crime. The second item of evidence was hearsay and therefore not sufficient under section 919 of the Penal Code. The theory of its admissibility in this case is most commonly applied where the pertinent feature is the reaction of a person to accusatory statements made to him. (See, *People* v. *Simmons,* 28 Cal.2d 699 [172 P.2d 18].) Conceding that such exception to the hearsay rule is not confined to the "accusatory statements" situation, its basic philosophy is that "silence gives consent," and the fundamental premises necessary for its application are that the one whose conduct is concerned must have heard the statement and it must have been made under circumstances which required some comment on his part, such as a denial if it were not true. This evidence was clearly inadmissible under settled rules which have been ably stated as follows: First, ". . . it is usually said that the proponent of the evidence must show, not merely that the party was *present* when the remark was made (and 'presence' of course implies 'proximity within a distance sufficient to permit hearing'), but also that the party actually *heard and understood* what was said. But this seems too strict; the presence of a party may be assumed to indicate that he heard and understood." (Wigmore on Evidence, (3d ed.), § 1072.) Second: "The general principle of Relevancy (*ante,* § 29) tells us that the inference of assent may safely be made only when no other explanation is equally consistent with silence; and there is always another possible explanation—namely, ignorance, or dissent—unless the circumstances are such that a dissent would in ordinary experience have been expressed if the communication had not been correct. This much has always been conceded judicially when the question has been presented." (Wigmore on Evidence (3d ed.), § 1071.) And a third rule which is clearly applicable here, has been stated thus: "So, too, if the party had plainly no *motive for responding,* his silence permits no inference; and this is often the case *where the statement is addressed to another person,* and not to the party himself. Much more is the silence without significance when a deterrent motive, such as fear, was operating upon the party." (Wigmore on Evidence (3d ed.), § 1072.) Applying these rules in the instant

case it is obvious that the silence of Woodmansee did not constitute an adoption of Trujillo's statement that a "job" was going to be done by them the following night. There was no evidence before the grand jury of any previous relationship or acquaintance between Trujillo and Woodmansee. The conversation between Foakes and Trujillo took place in a pool room where there obviously would be noise. Foakes was talking to and with Trujillo. He was not talking to Woodmansee. As far as appears Woodmansee was merely a stranger who happened to be in the pool room. There is no showing that he was in such proximity to the conversation that he could hear what was said. There were other persons in the pool room. The only reference by Trujillo was to a "creamery job." There is nothing to show what was meant by a "job," and he said no more than that Woodmansee and he would *"probably* go on the job together." It does not appear that Woodmansee could have heard the conversation. He did not participate in the conversation. He was a stranger to it. It did not call for a denial on his part. Trujillo simply made a vague suggestion that Woodmansee would go on the job with him. What kind of a job was not mentioned.

The foregoing evidence being eliminated there is nothing left but the hammer. That is no evidence at all. It was not identified as the property of Woodmansee.

· Here Woodmansee's motion to set aside the indictment on the ground that it had no evidentiary support was denied. That was an interlocutory order before judgment. Such interlocutory orders are reviewable on appeal from the judgment of conviction. It is said: "Upon appeal taken by the defendant, the appellate court may, without exception having been taken in the trial court, *review any question of law involved in any ruling, order, instruction, or thing whatsoever said or done at the trial or prior to or after judgment,* which thing was said or done after objection made in and considered by the lower court, and which affected the substantial rights of the defendant." (Pen. Code, § 1259.) [Emphasis added.] (See, also, Pen. Code, § 1237; 8 Cal.Jur. 560.)

Since it has been held that the court has no *jurisdiction* to try a case where there is no evidence to support the indictment (*Greenberg* v. *Superior Court*, 19 Cal.2d 319 [121 P.2d 713]), the only possible conclusion is that the conviction of Woodmansee cannot be sustained. The case of *People* v. *McCalla*, 63 Cal.App. 783 [220 P. 436], which holds that it is not preju-

dicial error to deny a motion to quash an information where there was no preliminary hearing, should be disapproved. As the court lacked jurisdiction under the Greenberg case to proceed with the trial on the indictment against Woodmansee, the judgment against him must be reversed.

Schauer, J., concurred.

Appellant Woodmansee's petition for a rehearing was denied July 8, 1948. Carter, J., and Schauer, J., voted for a rehearing.