[Crim. No. 967.   Fourth Dist.   July 2, 1954.]

THE PEOPLE, Respondent, v. LOWELL DWAYNE HOOKER et al., Appellants.

G. Keith Sprague, Chapman & Sprague and C. A. Broderick for Appellants.

Edmund G. Brown, Attorney General, and Martin M. Ostrow, Deputy Attorney General, for Respondent.

GRIFFIN, J.—Separate grand jury indictments were returned against defendants and appellants Lowell Dwayne Hooker, Jack Lee Thompson and Jack Leimas, charging in count one that each conspired with the other named appellants and defendant Richard Earl Burson to steal a Lincoln automobile. In a second count each was charged with grand theft of the same car. Pleas of not guilty were entered and by stipulation the actions were consolidated for the purposes of trial. A jury was waived. Appellants did not testify at the trial. Judgment of not guilty was rendered on the first count, and guilty on the second count as to each defendant. Defendant Burson did not appeal.

The only contentions are: (1) that the evidence is insufficient as a matter of law to show grand theft; and (2) that the testimony of two accomplices given on behalf of the prosecution was not, as a matter of law, sufficiently corroborated.

One Tedrick, owner of a 1953 Lincoln automobile, parked his car on October 6th, 1953, in front of his home in Wrightwood. It was locked at the time. At 6 o'clock the next morning he discovered it was gone, and testified that he gave no one permission to take it. He saw the car two days later in Victorville. At that time the trunk on the back of the back seat had been torn open and the arm rest and partition into the trunk had also been torn out. The right front wind wing had been broken and pried open. Several items had been removed from the trunk, namely, a rubber boot, dust mop, case for a fishing pole, a lantern, and a jack handle.

An accomplice, Jerry Roland Ferritor, testified that on October 6, 1953, he drove to Victorville in his 1946 white Ford, where he picked up appellants Thompson, Hooker and Leimas; that they drove around for a while and bought some liquor and later went to a little hill called the "Narrows," located about a half mile from Victorville; that they followed a car of defendant Burson there; that seated in Bur-

son's car were one Henley, Dietta Burson (Burson's sister), one Poindexter, and one DeMarias; that when both cars arrived there Ferritor, together with appellants Thompson, Hooker and Leimas, emerged from Ferritor's car, while Henley and defendant Burson stepped out of Burson's car; that Burson and Leimas had an argument, followed by a fight between DeMarias and Poindexter; that Burson armed himself with a chain; that Ferritor had a .38 pistol and defendant Leimas had a .22 gun that would only fire blanks; that Thompson had a .44 pistol; that following this encounter all parties went back to their respective cars and drove away; that they bought some beer and returned to the "Narrows" and at that time a discussion was held between the three appellants herein and defendant Burson to the effect that they were low on money and wanted to obtain some; that in substance it was said: "Let's go and get some money somewhere," and the cars left the hill with the respective parties in them; that subsequently Burson parked his car near a café in Victorville, and he and Henley then entered Ferritor's car; that all six people, including these appellants, drove in Ferritor's car to "pull a robbery" somewhere; that the party of six stopped in front of a restaurant near Desert Springs and that Ferritor went into the restaurant to see what it looked like; that he returned to the car saying that he knew some people inside and that he was opposed to going through with it; that he drove the car into a position where the occupants could look into the front door of the restaurant; that appellant Thompson saw someone he knew inside, so the occupants of the car decided to try the Blue Ridge Inn, at Wrightwood, a few miles from there; that after they arrived in Wrightwood Ferritor decided not to use his car in a holdup since it was registered in his name, so someone in the group suggested that they pick up a car; that they drove around Wrightwood until they saw a 1953 Lincoln parked on a side street next to a house; that Ferritor's car was left about one and one-half blocks from the Lincoln; that all six men walked back to the Lincoln automobile; that Henley pried open the right wind wing and the door was then unlocked; that Thompson and Hooker, together with Henley, entered the car while the remaining three men, including Leimas, pushed the car for a ways down the hill; that they then entered Ferritor's car and drove to the Lincoln; that at that time Hooker "hot wired the car" by placing a tinfoil from a cigarette package behind the dash; that both cars were then driven up into

the mountains, about three miles from the highway; that Ferritor's car was left there and all six men returned to the Blue Ridge Inn in Wrightwood in the Lincoln; that they found the Blue Ridge Inn closed and a discussion followed in which they could not agree upon any other place to break into or rob; that at this time they were interrupted by an approaching vehicle which seemed to be following them so they left Wrightwood; that they returned to the Ford and Ferritor and Hooker left in it, with the other men following behind it in the Lincoln; that they went to a deserted house near Phelan and parked the Lincoln in a garage; that Burson and Henley then broke into the trunk through the back seat and removed a dust mop, a lantern, and a rubber boot; that subsequently the six men returned to Victorville in the Ford and proceeded back to the place where they left Burson's car; that Burson and Henley left the Ford and returned to Burson's car; that Dietta Burson and the two men were in Burson's car; that Ferritor then drove Leimas and Hooker to Leimas' automobile and he subsequently took Thompson home.

He then testified that following this evening, he again saw Hooker, Leimas and Thompson and that the four of them drove to where the Lincoln had been parked; that Thompson and Hooker got into the Lincoln and Ferritor and Leimas returned to Victorville; and that was the last time he saw the Lincoln automobile.

It was stipulated that the testimony of the witness Henley, an accomplice, would be the same as the testimony of Ferritor.

By way of corroboration, the owner of the Yucca Inn, near Desert Springs, testified that between midnight and 2:30 a. m. on the night of October 6, 1953, she noticed a car approach and park in front of her place of business for a few minutes; that there were five or six persons in the car: that three men emerged and went through to the patio and looked into the café; that they went around the café out of sight and subsequently returned to the car and drove off; that later, the car again approached the Yucca Inn and Ferritor emerged from the car and came into the café; that he remained in there for a moment and then returned to the car which was driven off as far as the highway and it remained on the highway for 15 or 20 minutes. She identified this car as a grey sedan.

Dietta Burson testified that she went with her brother and Henley and two others to the ''Narrows''; that in Ferritor's car, described as a white Ford sedan, were Leimas, Hooker,

Thompson and Ferritor; that while they were there an argument ensued; that the boys went back in their respective cars to Victorville and purchased some liquor and returned to the "Narrows"; that another discussion ensued and they all returned in their respective cars to Victorville; that about 11 p. m., Burson, Henley, Ferritor, Leimas, Thompson and Hooker all left in Ferritor's car and two or three hours later the "same six people" returned. (On cross-examination, however, she testified she knew Burson and Henley got out and came to their car but did not count the heads of the remaining occupants in Ferritor's car on their return, and did not know whether it was three or five or six in number, and did not exactly recognize either the number or identity of those remaining); that on the way home Henley told her the boys had been to Wrightwood at the Blue Ridge Inn. The admission of this conversation was limited to the conspiracy count.

She further testified that several days later, she, Burson and Henley were driving in the vicinity of Phelan, near some old buildings, and Henley said that the Lincoln "car was gone . . . Doggone it, it is gone, the so and sos took the car"; that Henley said he intended to strip the Lincoln and sell the parts and that all of the fellows who were in Ferritor's car the night they left her in Victorville, had gone to Wrightwood and stolen a Lincoln.

She testified that several days later she had a conversation with appellant Thompson about this and asked him if he had had fun at Wrightwood; that he asked her what she meant by that and she replied that she knew all about "what the guys did up there," and he asked her who had told her; that she replied "Henley"; and that defendant Thompson said: "Oh, is that so?"

One DeMarias, who was with Dietta Burson at the "Narrows" testified that someone of the group of fellows said "something about pulling a job"; that after they were gone for about two or three hours they returned; that the next evening he met Thompson and Hooker on the street and they inquired whether Henley and Burson had told him (DeMarias) what they did last night and he told them that they had not and that they said "O.K."

A deputy sheriff testified he found Hooker, Thompson and Leimas and Ferritor on October 9, about 1 p. m. parked in a white 1946 Ford sedan on Highway 66, near Palmdale, not too far from the Phelan ranch where the Lincoln had been

left; that in this car was the "fake .22 pistol" which Leimas admitted was his gun. The lantern, which was removed from the Lincoln, was identified as having been recovered from Burson's house. The rubber boot and fishing case were found at the abandoned ranch in Phelan, in the garage.

It is clear from this testimony that the named defendants decided to use another car in their holdup activities; that they broke into and took the Lincoln car; that they drove it away 30 miles from the place where they stole it and parked it in an abandoned garage where they apparently intended to store it for their future use; that they tore out the back seat and rifled the trunk and appropriated some of the objects found therein to their own use; that they returned to the secret hiding place where the car had been parked with the intent to strip it or to use it in furtherance of their activities. The evidence fully supports the finding that the car was stolen and that the defendants intended to permanently deprive the owner of its possession, in violation of section 487 of the Penal Code, as distinguished from section 499b of the Penal Code. (*People* v. *Orona,* 72 Cal.App.2d 478 [164 P.2d 769]; *People* v. *Renteria,* 60 Cal.App.2d 463 [141 P.2d 37]; *People* v. *Stanley,* 92 Cal.App. 778 [269 P. 465].)

The testimony of the two accomplices sufficiently shows the commission of the crime charged and that the appellants herein aided and abetted in the commission thereof. (Pen. Code, § 31.) The judge apparently believed their testimony. The only question is whether it was sufficiently corroborated under section 1111 of the Penal Code.

Historically speaking, under the common law, the uncorroborated testimony of an accomplice was sufficient to sustain a conviction. (*People* v. *Clough,* 73 Cal. 348 [15 P. 5].) Section 1111, *supra,* provides that "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

Some earlier cases, in applying the test, have remarked that to determine the sufficiency of the corroboration we must "eliminate from the case the evidence of the accomplice, and then examine the evidence of the other witness or witnesses with the view to ascertain if there be inculpatory evidence—evidence tending to connect the defendant with the offense. If there is, the accomplice is corroborated; if

there is no *inculpatory* evidence, there is no corroboration, though the accomplice may be corroborated in regard to any number of facts sworn to by him''; that corroboration is not sufficient if it requires interpretation and direction to be furnished by the accomplice to give it value; that such evidence ''must tend directly and immediately to connect the defendant with the commission of the offense.'' (*People* v. *Morton*, 139 Cal. 719 [73 P. 609], quoting with approval from *Welden* v. *State*, 10 Tex. Crim. 400, and *Sims* v. *State*, 8 Tex. Crim. 230; see also *People* v. *Sciaroni*, 4 Cal.App. 698 [89 P. 133] ; *People* v. *Reingold*, 87 Cal.App.2d 382 [197 P.2d 175].)

A later expression of the rule is in *People* v. *Negra*, 208 Cal. 64, at page 69 [280 P. 354], where it is said:

''While the jury may consider the circumstance that a witness is an accomplice, in passing upon his credibility as a witness . . . his testimony is not to be rejected merely because he is an accomplice, and if there is other evidence which measures up to the requirement of the code . . . , tending to connect the defendant with the commission of the crime charged, then such testimony of the accomplice is to be considered by the jury, as is any other testimony, and must be given the weight to which the jurors may conclude that it is entitled. . . . The evidence tending to connect a defendant with the commission of the crime may be slight and, when standing by itself, entitled to but little consideration. . . . The law does not require that the evidence necessary to corroborate the testimony of an accomplice shall tend to establish the precise facts testified to by the accomplice; and strong corroborative testimony is not necessary to support a judgment of conviction founded on the testimony of an accomplice. Even though circumstantial and slight, the evidence is, nevertheless, sufficient if it tends to connect the accused with the commission of the offense. . . . The defendant's own statements and admissions, made in connection with other testimony, may afford corroboratory proof sufficient to sustain a verdict. . . . It is not necessary that the corroborating evidence should go so far as to establish by itself, and without the aid of the testimony of an accomplice, that the defendant committed the offense charged.''

See also *People* v. *Trujillo*, 32 Cal.2d 105 [194 P.2d 681] ; *People* v. *Griffin*, 98 Cal.App.2d 1 [219 P.2d 519] ; *People* v. *Gallardo*, 41 Cal.2d 57 [257 P.2d 29], commenting on the Morton case; and *People* v. *Henderson*, 34 Cal.2d 340, where it is said, at pages 342-343 [209 P.2d 785] :

"Although the corroborating evidence must raise more than a conjecture of suspicion of guilt, it is sufficient if it connect the defendant with the commission of the crime in such a way as reasonably to satisfy the fact finding body that the accomplice is telling the truth. . . . The evidence of inculpatory participation need not be direct nor extend to every fact and detail. It may be circumstantial and is sufficient, even though slight, if it tend to connect the defendant with the commission of the crime. . . .

"The relationship of the men and all of their acts and conduct may be considered in determining whether there are corroborating circumstances."

■ Applying these rules the accomplices gave a full account of what happened on the night in question and named the parties who participated therein. These appealing defendants were in the party at the "Narrows." Their actions and conduct there and their intended plans after leaving there were shown by independent evidence. The fact that these appealing defendants left in the car with the admitted accomplices is also shown. The time they were gone is indicated, and the fact that they returned together in the car is sufficiently established and fully corroborates the testimony of the accomplices in this respect. Parts belonging in the car were found at the deserted garage where the accomplices said the defendants parked the car, as well as in the home of one of the accomplices. These same persons returned to the abandoned garage where the car was originally parked and they were later apprehended in that vicinity while seated in the car belonging to the accomplice, in which a gun, previously described by a witness not an accomplice, was found. The conduct of these appealing defendants, both before and after the crime was committed, certainly tends, since it was not explained away, to indicate evidence of appellants' consciousness of guilt, and tended to show some connection with the crime that was committed.

It has been held in *People* v. *Sawaya*, 46 Cal.App.2d 466 [115 P.2d 1001], that the failure of the defendant to take the witness stand does not of itself directly and immediately tend to connect him with the crime charged, and is not to be considered in connection with corroborative evidence not measuring up to the requirements of Penal Code, section 1111.

■ In *People* v. *Ashley*, 42 Cal.2d 246, 268 [267 P.2d 271], however, where the People made the contention that

defendant's failure to testify may be considered corroborative, our Supreme Court said:

"A defendant's failure to take the stand 'to deny or explain evidence presented against him, when it is in his power to do so, may be considered by the jury as tending to indicate the truth of such evidence, and as indicating that among the inferences that may reasonably be drawn therefrom, those unfavorable to the defendant are the more probable.' (*People* v. *Adamson,* 27 Cal.2d 478, 489 [165 P.2d 3].) But the failure to testify will not supply a lacuna in the prosecution's proof. (Citing cases.) . . . In criminal cases, after the prosecution has made a prima facie case, the failure of the defendant to testify is not affirmative evidence of any fact, and any inference that can, in the circumstance, be justly drawn therefrom is persuasive rather than probative, lending weight to the evidence presented by the prosecution."

In the instant case we conclude that the corroborative evidence adduced by the State was sufficient to allow the case to go to the court for its decision, and it could then consider the defendant's failure to deny or explain that evidence in determining the weight it was to be given.

Judgments and orders affirmed.

Barnard, P. J., and Mussell, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 28, 1954.