[Crim. No. 4213. Second Dist., Div. One. Sept. 2, 1948.]

THE PEOPLE, Respondent, v. MAURICE MONTE REINGOLD, Appellant.

Jerry Giesler and Ward Sullivan for Appellant.

Fred N. Howser, Attorney General, and Walter L. Bowers, Assistant Attorney General, for Respondent.

WHITE, J.—In an indictment returned by the Grand Jury of Los Angeles County, the defendants were jointly charged in count I with the crime of robbery, and in count II with the crime of kidnapping for the purpose of robbery, relating to the offense alleged in count I.

Defendant Maurice Monte Reingold filed a motion to quash and set aside the indictment, a motion that the court of its own motion, dismiss the indictment under section 1385 of the Penal Code, a demurrer to the indictment, and a motion for a separate trial from his codefendants. He likewise filed a request made to the district attorney to ask for a dismissal of the indictment under the provisions of section 1385 of the Penal Code. His motions to quash and dismiss the indictment were denied, his demurrer overruled, and his motion for a separate trial denied without prejudice, whereupon he entered his pleas of not guilty to each count of the indictment. Subsequently, when the cause was called for trial defendant Maurice Monte Reingold renewed his motion for a separate trial and the same was again denied.

Defendant Gail Reingold changed his plea from not guilty to guilty as to count I, and, on motion of the district attorney,

counts I and II of the indictment were severed for trial, and the·cause proceeded to trial on count I as to defendants Maurice Monte Reingold, Albert Greenburg and Joe Miller.

During the course of the trial, count I was dismissed as to defendant Greenburg, and he testified as a witness for the People.

At the conclusion of the trial the jury returned verdicts finding defendants Maurice Monte Reingold and Joe Miller guilty of robbery as charged in count I of the indictment, finding the offense to be robbery of the first degree, and further finding that said defendants were armed at the time of the commission of the offense. Count II of the indictment was subsequently dismissed.

Defendant Maurice Monte Reingold moved for a new trial, which motion was denied. He prosecutes this appeal from the verdict of the jury finding him guilty of the crime of robbery in the first degree; from the verdict finding that at the time of the commission of said robbery he was armed with a deadly weapon; from the judgment of conviction, and from the order denying his motion for a new trial.

As grounds for a reversal, appellant urges:

I

That the verdict is contrary to the law and to the evidence.

II

That the court erred in reference to alleged accusatory statements:

(a) In permitting one such alleged statement to remain in the record; and

(b) Having left one such statement in the record, in failing to instruct the jury in accord with request of appellant, advising the jury how and for what purpose to consider such statement.

III

That the court abused its discretion in failing to grant appellant a trial separate and apart from his codefendants.

Epitomizing the testimony adduced at the trial, the record reveals the following: Appellant was a man some 55 years of age, married and the father of a daughter, residing in the city of Beverly Hills, Los Angeles County, in his own home, which was free from debt; that he was engaged in a successful jewelry business located at Wilshire Boulevard and Beverly Drive, one of the most prominent corners in the city of Beverly

Hills, where he had been doing business for some seven and one-half years under the firm name of M. Reingold, Incorporated. That appellant was a man of considerable means, and not involved in financial difficulties on April 2, 1947, the date of the robbery charged against him. That appellant had a brother, Gail Ringold, a named codefendant, who was a man about 60 years of age and employed by appellant in his store as a salesman at a salary of $200 per week with a bonus at the end of each year, and likewise a special bonus upon the consummation by him of the sale of any particularly important or valuable item of jewelry.

Mrs. Sadie Genis, the victim of the robbery, lived with her husband in an outside apartment consisting of the second and third floors facing on the street at 9543 Charleville Drive, three blocks from appellant's jewelry store, in the city of Beverly Hills. She had known appellant Maurice Monte Reingold, better known as Moe Reingold, and his brother Gail, for several years. During this interval she had patronized appellant's store and purchased various articles of jewelry from him and his brother. She testified that appellant had told her that his brother was a member of the firm and could be dealt with the same as if she were dealing with appellant. It appears from the record, according to the testimony of Mrs. Genis, that defendant Gail Reingold, brother of appellant, was a social acquaintance of herself and her husband, had played gin rummy at the Genis' home on at least one occasion, and that the victim and her husband had accompanied defendant Gail Reingold and his fiancée to dinner on another occasion.

In the fall of 1946, Gail Reingold telephoned Mrs. Genis that he had a ''quick buy,'' that some client of theirs had lost money on the stock market and needed cash quickly. He asked her if he could bring a ring up to the house, to which she agreed. Gail Reingold then took the ring to Mrs. Genis' apartment. According to her testimony he represented that it was a 21 karat diamond and told her that he wanted $40,000 or $45,000 for the ring. She told him she could not purchase it without taking the matter up with her husband and having it appraised. Gail Reingold thereupon left the ring with her for that purpose. According to the testimony of Mrs. Genis, Gail Reingold told her that the ring had been originally purchased at the cost of $60,000 from Jack, Starr and Frost in New York and now belonged to a moving picture outfit in Los Angeles County. After negotiations back and forth, and following appraisal of the ring by Mrs. Genis and her husband,

the former made an offer of $30,000, which defendant Gail Reingold attempted to get her to raise by an additional $1,500, which he told her he must make for himself. Mrs. Genis refused, and made a final offer of $30,000, which finally was accepted. When Mrs. Genis came into the store to make out a check and inquired as to whom she should make the same payable, according to her testimony, appellant told her to make it out to M. Reingold, Incorporated. Previously, according to testimony of Mrs. Genis, defendant Gail Reingold had told her there was no tax attached to the purchase because it was bought from a private party. Consequently, according to her testimony, when she was requested to make the check payable to M. Reingold, Incorporated, she said, ''Mr. Reingold, does not this involve a tax feature? This is supposed to be a private party. If I make it out to you, that involves the tax feature.'' Thereupon she telephoned to her husband, and it will suffice to say that following such conversation Mrs. Genis refused to go through with the purchase of the ring, and the same was returned by appellant to Harry Winston Company, New York jewelers, to whom it belonged, and who had left it with appellant to be sold on consignment. If so sold, Harry Winston Company was to receive $18,500 for the ring.

Subsequently, Mrs. Genis learned that Harry Winston Company owned the ring, and in the latter part of November, or in December of 1946, she purchased the ring from the owners for $19,000, plus the tax, which she paid, a total amount of $22,800.

Some time between January 6 and 15, 1947, Mrs. Genis received a bill in the mail from appellant for other purchases made by her and went to the store to consult him about the same. According to her testimony, at that time both appellant and his brother Gail were in the store and Mrs. Genis informed them that she had purchased the ring from the Winston Company for some $8,000 less than the Reingold brothers had offered to sell it. After some conversation, according to Mrs. Genis, Gail Reingold left the store and appellant then upbraided her, calling her a ''son-of-a-bitch'' and telling her that ''she would never get away with it if it was the last thing he did.''

There was testimony that appellant was acquainted with his codefendant Miller since about November, 1930, when the latter, then going under the name of Harris, called upon appellant at his jewelry store, then located in the Title Guarantee Building in downtown Los Angeles.

Defendants Miller and Greenburg had been acquainted with each other for "a few years," having met in New York City.

Defendant Greenburg came to Los Angeles some time about August or September, 1946, with his wife, and engaged in the restaurant business in Hollywood. Just prior to Christmas of that year defendant Miller called to see Greenburg at his restaurant and soon thereafter commenced calling upon the latter quite often.

Early in the year 1947, defendants Greenburg, Miller and Gail Reingold met in a cafe on Sunset Boulevard. On that occasion Gail Reingold said he knew a woman to whom he had attempted to sell a ring, that she didn't buy it from him, but eventually purchased it. At this meeting, according to the testimony of Greenburg, defendant Gail Reingold made arrangements with him "to take her."

According to the testimony of defendant Greenburg, on the morning of April 2, 1947, he and defendants Miller and Gail Reingold met; Gail Reingold informed his codefendants that Mrs. Genis was in her apartment and that Miller and Greenburg should go up there and "they would get her." According to Greenburg, he told Gail Reingold that he had no gun, whereupon Reingold walked in the direction of appellant's store and came back in a few moments with a .32 Colt automatic.

Thereupon, defendants Greenburg and Miller entered the apartment of Mrs. Genis in broad daylight, during the morning of April 2, 1947, and robbed her. During the course of the robbery defendant Miller assaulted Mrs. Genis with his gun, striking her on the head, thereby causing her to suffer severe head injuries. During the course of the robbery, jewelry of the value of approximately $125,000 was stolen. There is testimony that during the robbery one of the bandits demanded to know where the "big ring" was, and also told her that he followed her in Phoenix, Arizona, and was familiar with her jewelry.

We do not deem it necessary to further set forth the testimony concerning the robbery and subsequent events as given by defendant Greenburg, who testified for the prosecution after the charge against him had been dismissed, other than to say that, according to his testimony, defendant Gail Reingold had employed him and Miller to commit the robbery, and paid them $5,000 therefor; that the jewelry of the estimated value of $125,000 was turned over to Gail Reingold;

that the latter supplied Greenburg with a gun on the morning of the robbery, which Greenburg testified he used in the robbery and later returned to defendant Gail Reingold at the latter's home. According to the testimony of defendant Greenburg, the gun was similar in size and caliber to the gun found in appellant's desk on the night of his arrest. Greenburg further testified that some three weeks after the robbery he read in the papers of the value of the jewels stolen, and claimed to have been "double-crossed" by defendant Gail Reingold, since the latter had told him he had sold the jewelry for $7,500. That Greenburg called on Gail Reingold and asked for more money, whereupon the latter asked him to come to the store the next day and he would give him $200 additional. That he went to the store the next day, waited for Gail Reingold for an hour, became impatient and went into the store, at which time he testified appellant spoke to him asking if he could help him. That Greenburg then said, "Sure, you can help me. It's a fine double-cross you guys gave me." That appellant looked at him and asked, "What do you mean?" to which Greenburg replied, "You know what I mean. Where is that brother of yours?" That appellant stated his brother would arrive shortly and remarked, "You got your money, didn't you?" That about that time defendant Gail Reingold walked in, told appellant that he had promised Greenburg a couple of hundred dollars and asked appellant to get it for him. That the latter then produced two $100 bills, gave them to Greenburg, saying, "What is the matter with you? You are too hot for around here. Why don't you get smart to yourself and stay away from here."

About July 10, 1947, an attorney representing Gail Reingold reported to the police that some man had come to his office that day and left a package containing the jewelry stolen in the robbery, which the attorney delivered to the Beverly Hills Police Department.

On the morning of July 17, 1947, about 9 o'clock, appellant was arrested while on his way from his home to his office. He was held in the Beverly Hills jail all that day, was constantly questioned and requestioned, during which inquisition he was accused of complicity in the robbery of Mrs. Genis, all of which he emphatically denied. He testified that he was booked and taken into the showup room, was not permitted to telephone to his wife and daughter or to his store, nor his attorney, throughout the day. That he was accused of being

acquainted with his codefendants, the robbers Greenburg and Miller, all of which he denied.

Testifying as a witness in his own behalf, appellant denied ever having personally had any dealings with Mrs. Genis or with ever having personally sold her any jewelry, that he had not seen her more than eight times in his life. He denied having ever talked with her about the "big ring" or having told her to make out the check for same to M. Reingold, Incorporated. He denied ever using any abusive language to Mrs. Genis, or making any statement to the effect that he would get even with her if it was the last thing he ever did.

Appellant also denied that he had ever seen his codefendant Greenburg in his jewelry store at all, or that any of the aforesaid conversation between himself and Greenburg occurred. He denied absolutely that he had ever supplied Greenburg with $200 or that his brother had obtained that amount or any other money from him to give to Greenburg.

On the evening of the day when appellant was arrested, he was taken, with his permission and acquiescence, to his store about 9 o'clock in the evening in the company of three police officers, whereupon he opened the store vaults to permit the officers to search for the stolen jewelry, but the same was not found. The officers testified that appellant made false statements during the day of his arrest and also on that evening as to not owning a gun. That he stated he did not possess a gun, nor did he have one in the store, but that when they entered the store appellant opened the desk and a .32 caliber automatic gun was lying there, that appellant made certain false statements in reference to the ownership of the gun, and with reference to his knowledge of its being there. In connection with this incident, which will be more fully treated hereinafter, appellant, on his part, testified to his state of mind, of fright, fear and confusion in regard to the circumstances surrounding the statements as to the gun, and also concerning an episode regarding certain questions, which will be referred to later.

Appellant concedes that the evidence in the case at bar clearly established without contradiction that defendants Albert Greenburg and Joe Miller committed the offense of robbery as charged in count I of the indictment, and in a daylight robbery in the city of Beverly Hills obtained from the victim some $125,000 worth of jewelry, in the course of which robbery the victim was brutally beaten about the head and severely

injured. That it is further clearly established, in view of the plea of guilty of the codefendant Gail Reingold to this charge of robbery, that he was equally guilty of the same with the said two codefendants Greenburg and Miller.

As to appellant Maurice Monte Reingold we are confronted with a situation wherein there is no direct evidence connecting him with the crime of which he was convicted, for the reason he did not actually participate in the robbery. Therefore he could be convicted only on the ground that though inactive during the commission of the offense, he had previously advised and encouraged the holdup. The only direct evidence that appellant knew of the contemplated robbery or that he had previously advised and encouraged it is supplied by the witness Greenburg. And this evidence consisted only of a conversation Greenburg had with appellant subsequent to the perpetration of the robbery, wherein the former attributed to the latter a certain statement, to be later discussed, indicating that appellant, subsequent to the commission of the offense, and at the time of the conversation, had some knowledge that the crime in question had been committed. The witness Greenburg concededly being an accomplice, his testimony must be corroborated, pursuant to the provisions of section 1111 of the Penal Code, which, so far as here pertinent, reads: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. . . ."

Where, as here, proof of guilt of the crime charged rests primarily and solely upon the testimony of an accomplice, the statute makes imperative corroboration of the testimony of such an accomplice as an essential prerequisite to the conviction of the accused.

As to what constitutes sufficient corroboration of the testimony of an accomplice, we have the following rule enunciated by our Supreme Court in the case of *People* v. *Morton,* 139 Cal. 719, 724 [73 P. 609], wherein the following language taken from *Weldon* v. *State,* 10 Tex.App. 400, is quoted with approval:

". . . eliminate from the case the testimony of the accomplice, and then examine the evidence of the other witness or witnesses with the view to ascertain if there be inculpatory evidence—evidence tending to connect the defendant with the

offense. If there is, the accomplice is corroborated; if there is no *inculpatory* evidence, there is no corroboration, though the accomplice may be corroborated in regard to any number of facts sworn to by him." And in the Morton case, *supra,* the Supreme Court places its imprimatur upon the rule announced in *Simms* v. *State,* 8 Tex.App. 230, as follows: "The evidence must tend directly and immediately to connect the defendant with the commission of the offense." In other words, to be of any avail, the corroboration, however strong in all other respects, must point to the connection of the defendant with the commission of the crime.

While it is true that the corroborative evidence is sufficient if it, of itself, tends to connect the defendant with the commission of the offense, although it is slight, and entitled, when standing by itself, to but little consideration, nevertheless, the rule is firmly established in our law that more is required by way of corroboration than mere suspicion or even grave suspicion (*People* v. *Braun,* 31 Cal.App.2d 593, 600, 601 [88 P.2d 728], and cases therein cited; *People* v. *Shaw,* 17 Cal.2d 778, 803, 809 [112 P.2d 241] ; *People* v. *Lima,* 25 Cal.2d 573, 579, 580 [154 P.2d 698] ).

We may, therefore, epitomize the requirements of section 1111 of the Penal Code by saying, first, that the corroboration is not sufficient if it *requires interpretation and direction* to be furnished by the accomplice's testimony to give it value; second, that the corroborative evidence to be sufficient and of the required *substantial* value *must tend directly and immediately* to connect the defendant with the offense charged against him; and, third, that the corroborative evidence is insufficient when it merely casts a grave suspicion upon the accused.

We use advisedly the word "substantial" with reference to the value to which the corroborative evidence must rise, for, as said in *People* v. *Janssen,* 74 Cal.App. 402, 410 [240 P. 799] : "The legislature, acting within the scope of its authority, has provided that, to justify the conviction of a defendant, there must be *substantial* corroboration of the testimony of an accomplice. The lawmaking body doubtless had a good reason for this rule of evidence, and based it upon what it conceived to be a *sound public policy.* The judicial department may not ignore the rule without unwarrantably invading the rights of the accused." (Emphasis added.) See also *People* v. *Sciaroni,* 4 Cal.App. 698, 700 [89 P. 133] ; *People* v. *Dail,* 22 Cal. 2d 642, 655 [140 P.2d 828].

While the law in its anxiety to prevent the guilty from escaping punishment for their crimes permits an accomplice who confesses his own infamy to be a witness, it also recognizes the strong motive that undoubtedly actuate such a witness to prove the defendant on trial to be guilty of the offense, and to palliate as much as possible his own guilt. And with equal solicitude for the protection of the citizen, the law watches with jealous scrutiny the testimony of an accomplice, and will not permit any person to be convicted solely by the testimony of an accomplice, but requires substantial corroboration of his statements from independent sources.

With the foregoing legal principles in mind, we now turn to the record to discern in what respects, if at all, the testimony of the accomplice Greenburg was corroborated.

It may serve to clarify an understanding of respondent's claimed sufficiency of the corroborative evidence to here summarize the testimony of the accomplice which was sought to be corroborated.

At the outset it is conceded that Greenburg at no time prior to the commission of the crime met or talked with appellant, and according to the former's testimony, his only contacts were with his codefendants Miller and Gail Reingold, who he claimed laid out the plans for the commission of the robbery. The only mention of appellant by the accomplice Greenburg relating to a time prior to the commission of the robbery was his statement that appellant's brother in his meetings ''kept saying before he can give us everything he would have to consult with his brother.''

The only other reference to appellant by Greenburg in the latter's testimony related to a time after the robbery. In that regard, the accomplice Greenburg testified· that after he and his codefendant Miller had stolen the jewelry from the victim, he delivered it to Gail Reingold at the latter's home; that later Gail told him he had sold the jewelry for $7,500 and that he was giving Miller and Greenburg $5,000, or two-thirds of what he had sold it for; that some time later he, Greenburg, read something in the newspaper about the value of the jewelry taken, wherein it was referred to as a $100,000 jewelry robbery; that he then went to the home of Gail on the night that this appeared in the paper, about three weeks after the robbery; complained to him about his ''cut'' and demanded more money; that he then asked Gail for $1,000 and Gail told him to come to the store the next day about 1 o'clock.

With reference to what transpired at the store, according to the testimony of the accomplice Greenburg, we herewith set forth such testimony from the reporter's transcript:

"Q. Now, the next day did you go to the Reingold store in Beverly Hills? A. I did.

"Q. Did you go there alone? A. All alone.

"Q. Was Gail in the store? A. No, sir.

"Q. How long did you wait around there for Gail, if you did wait for him? A. A good hour, hour and a half.

"Q. What did you do then? A. Well, I got disgusted of waiting.

"Q. Did you go in the store? A. I kept parading up and down in front of the store, and then I finally went into the store.

"Q. Who did you see in the store? A. And I walked in and I just looked around, Moe—Mr. Moe Reingold walked up to me——

"Q. Will you keep your voice up, please, Mr. Greenburg. A. Moe Reingold walked up to me and he asked me if he could help me. I said, 'Sure, you can help me. It's a fine double-cross you guys gave me.' He looked at me. He says, 'What do you mean?' I says, 'You know what I mean.' I says, 'Where is that brother of yours, Gail?' He says, 'Well, he should be here shortly.' He says, 'Your business is with Gail.' And he said, '*You got your money, didn't you?*' to that effect, and as we were talking Gail walked in, so Gail walked right up to us and he told his brother, he said, 'I promised this guy a couple of hundred dollars. Can you get—— will you get it for me?' With that Gail went and he got $200.00 and he gave it to me, two hundred-dollar bills, each one was a hundred-dollar bill.

"Q. Did Gail or Moe give you those two one-hundred dollar bills? A. Moe give it to me.

"Q. Moe gave them to you? A. That's right.

"Q. Before Gail joined the conversation between you and Moe was anything said by anybody about your hanging around? A. *Yes. Moe told me, he says, 'What's the matter with you? You are too hot for around here. Why don't you get smart to yourself and stay away from here.'*" (Emphasis added.)

The significant and particularly inculpatory portion of the foregoing testimony lies in the words allegedly uttered by appellant, "You got your money, didn't you?"

On cross-examination, the accomplice Greenburg was shown a transcript of his testimony given before the grand jury on July 15, 1947, some three months after the perpetration of the robbery, wherein the witness testified that when he stated to appellant, ''It's a fine double-cross you and your brother gave me,'' appellant said, ''What are you talking about? I don't know what you are talking about.'' The witness admitted he so testified before the grand jury.

Following the reading of excerpts from Greenburg's grand jury testimony to him, the following occurred:

''Q. Now, in that relation of that conversation in July, which was just several months after that, you said nothing, did you, about Moe saying to you, 'You have been paid,' did you? A. I didn't get that question.

''Q. *I said, when you testified before the Grand Jury in July, just several months after the occurrence of the event, you did not say anything about Moe, as you testified today, about Moe having said to you in the store there, 'You have been paid'; you didn't say anything about that, did you?* A. *It didn't come to me then.*

''Q. *It has come to you since, is that it?* A. *Well, it came to me since, sure.*'' (Emphasis added.)

We attach some importance to the inculpatory testimony given by the accomplice at the trial and not mentioned by him before the grand jury shortly after the commission of the robbery because of the state of mind of the witness as evidenced by him at the trial when, in answer to a question whether he meant what he had said, that he had gone on the witness stand and involved himself in the robbery in question without making any arrangements for immunity, he said, ''I was willing to do that, *and more,* for the reason that I was double-crossed.'' (Emphasis added.)

When asked if he had given no thought to what the consequences might be for him for implicating himself in a statement concerning the robbery, made to police officers in New York, the witness replied:

''A. I didn't give it no thought. I felt that whatever I told Mr. Borders (Beverly Hills police officer present in New York) I can always deny it if it comes down to it.

''Q. Your sole thought, then, was to get even with the Reingolds, even if you yourself got hurt in the process? A. I didn't care, I really didn't care. I was never double-crossed in my life.''

To us it seems a reasonable challenge to credulity to assume that had the accomplice Greenburg ever had any knowledge of a connection with appellant in the planning or consummation of the robbery, he would have waited around the jewelry store for more than an hour for the arrival of Gail Reingold and that when the accomplice finally entered the store, that he would make no approach to appellant but wait until the latter "walked up to me and he asked me if he could help me."

We might here pause to remember that if the "[e]vidence corroborative of an accomplice must tend directly and immediately to connect the defendant with the commission of the offense" (*People* v. *Lima,* 25 Cal.2d 573, 579 [154 P.2d 698] ; see also *People* v. *Ciani,* 104 Cal.App. 596, 601 [286 P. 459] ; *People* v. *Fagan,* 98 Cal. 230, 233 [33 P. 60]), it must necessarily follow that the testimony of the accomplice must tend to connect the defendant with the specific offense charged against him. All of the testimony given by the accomplice herein is consistent with the supposition that appellant only knew of the robbery after its commission, or that he was simply a receiver of stolen goods, knowing them to have been stolen. It is difficult to reconcile the testimony of the accomplice herein with the conclusion that appellant had, previous to the commission of the offense, advised and encouraged its commission. So much for the testimony of the accomplice himself.

Assuming however, that the testimony given by the accomplice was sufficient to warrant a conclusion by the jury that appellant was an aider and abettor in the commission of the offense of which he was convicted, we now turn to the circumstances relied upon by the prosecution as sufficient corroboratory evidence of the testimony given by the accomplice. They are as follows:

"(1) Appellant's knowledge of victim's possession of the large 18½ karat diamond ring, coupled with the fact that at the time of the robbery Miller kept demanding the 'big ring.'

"(2) Appellant's threats against Mrs. Genis when he found she had purchased this large diamond ring elsewhere. (His denial of the same.)

"(3) Appellant's acquaintance with the defendant Miller. (His denial of the same.)

"(4) Appellant's possession of a gun identical with that used in the robbery. (His denial of the same.)

"(5) Appellant's attempt to keep his desk keys, where the gun was found, from the officers.

"(6) Appellant's falsehoods: (a) that he had no dealings himself with Mrs. Genis and that she did not tell him she had purchased the ring elsewhere; (b) that he did not tell Mrs. Genis to whom to make the $30,000 check payable; (c) that he made no threat to Mrs. Genis; (d) that he had never seen the defendant Miller until at the time of this trial in the court-room; (e) that he did not have any gun; (f) that the gun found in his desk drawer was not his and he had never seen it before and had no knowledge of it; (g) that his employee Slack shared the desk with him and the gun probably belonged to Slack.

"(7) Appellant's failure to produce testimony."

With commendable candor, the attorney general does not contend "that each of these circumstances standing alone constitutes sufficient legal corroboration," but asserts that some of them do, and that "when taken altogether and the entire conduct of the appellant considered, his connection with the crime may be justly inferred—is, in fact, convincing—and that the corroboration is sufficient." In support of these claims, respondent relies upon the holding that "The law is well settled that the testimony of the accomplice need not be corroborated by direct evidence. The entire conduct of the defendant may be looked to for the corroborating circumstances and if from those circumstances the connection of the accused with the crime may fairly be inferred, the corroboration is sufficient." (*People* v. *Nikolich*, 93 Cal.App. 356, 358 [269 P. 721].)

But, neither in this case nor in any of the others cited by respondent do we find any holding militating against the basic rules hereinbefore announced by us for determining whether the corroborative evidence satisfies the requirements of section 1111 of the Penal Code.

We deem it a fair statement to say that an examination of the decisions will show that the evidence in each case must be considered in the light of these established rules, applied to its particular facts, and a determination reached accordingly.

The first two circumstances relied upon by respondent as corroborative evidence may be considered together—appellant's knowledge of the victim's possession of the large 18½ karat ring, coupled with the fact that at the time of the robbery, his codefendant Miller, one of the robbers, kept demanding the "big ring." The circumstances surrounding the acquisition of the ring are hereinbefore set forth in the statement

of facts and need not here be repeated. Respondent concedes that "this circumstance does not of itself constitute sufficient legal corroboration," and "fails to rise above a mere suspicion of guilt." We do not think it should be dignified as raising even a slight suspicion of guilt. To attach any evidentiary value to this knowledge on the part of appellant would be equivalent to saying that anyone possessing like knowledge would be a possible suspect. Respondent however, argues that such knowledge on the part of appellant constitutes a link in the chain of corroborative evidence which when taken as a whole satisfies the legal requirements of sufficient corroboration. With this we cannot agree because it amounts to no inculpatory evidence at all, either standing alone or viewed in conjunction with the other circumstances relied upon by respondent.

As to the threat allegedly made to the victim by appellant after she had refused to purchase the ring from his jewelry establishment and had acquired it from a New York firm, and in connection with which the victim testified that when she informed appellant of her purchase of the ring, "He called me a son-of-a-bitch and told me I would never get away with it if it was the last thing he did," we find ourselves in accord with the view of the trial judge, who, in ruling upon the motion for a new trial, said, "So far as the testimony as to the threat as to which Mrs. Genis testified indicating a motive, I do not feel that that would corroborate the testimony of an accomplice. I mention that because I believe that would be one of the things counsel would probably call to my attention, and as to that I would agree with him. The effect of that would be merely as tending to furnish some corroboration of the general picture, but not to corroborate the accomplice."

As to respondent's claim of acquaintance on the part of appellant with his codefendant Miller, one of the robbers, which was denied by the former, the attorney general in his brief states, "Our courts have more than once stated that mere acquaintanceship or association of a defendant with the actual perpetrator of a crime does not of itself constitute sufficient corroboration. We admit without question that it does not constitute sufficient corroboration." Respondent then relegates this circumstance to the same category as appellant's knowledge of the victim's possession of "the big" diamond ring and his threat against her. There can be no question that

it is insufficient corroboration merely to connect a defendant with the accomplice or other persons participating in the crime, but evidence independent of the testimony of the accomplice must tend to connect a defendant with the crime itself, and not simply with its perpetrators. It is not with the thief that the connection must be had but with the commission of the crime itself (*People* v. *Long,* 7 Cal.App. 27, 33 [93 P. 387] ; 12 C.J., § 231, pp. 638, 639 ; 16 C.J., § 1446, p. 708 ; 15 C.J.S., § 93, p. 1150 ; 22 C.J.S., § 812, p. 1397 ; 1 Encyc. of Evidence 107).

█ The fourth circumstance relied upon by respondent to corroborate the testimony of the accomplice is entitled, "Appellant's possession of a gun identical with that used in the robbery. (His denial of the same.)"

In this regard, the accomplice Greenburg testified at the trial that Joe Miller, his codefendant who participated in the robbery, was armed with a .22 revolver and that on the morning of the robbery he, Greenburg, did not have a gun but that before they went to Mrs. Genis' apartment Gail Reingold supplied him with a .32 Colt automatic.

With reference to this gun Greenburg testified that at his first meeting with Gail Reingold in the presence of Miller, at Victor's Restaurant on Sunset Boulevard, during the course of the conversation he, Greenburg, had said that he didn't have a gun and that Gail replied, "Don't worry about a gun, I will get you a gun"; that Miller had a .22 caliber automatic which Greenburg identified on the witness stand and which was received in evidence; that on the morning of the robbery, when Miller and he first drove to Beverly Hills, they only had the one gun—the .22; that they parked the car and Miller went to find the apartment of Mrs. Genis, could not locate it, came back and called up Gail Reingold; that Gail came over and met Miller and that Gail then went down to the apartment building; that Gail came back and told Miller and Greenburg that the woman was in her apartment, that he heard her talking on the telephone; Greenburg then testified that he then told Gail, "How about a gun, I have no gun," and Gail said, "All right, walk up the street and I will go back and bring you a gun"; that Gail went on up Beverly Drive; passed out of his view when he was walking on Charleville Drive, which is where Mrs. Genis lived; that when next he saw Gail the latter was not on Wilshire Boulevard but either on El Camino or Beverly Drive; that when Gail returned he

came up to them and gave Greenburg a gun; Greenburg testified that Gail gave him a black .32 Colt revolver.

On cross-examination, in reference to this episode, Greenburg testified with reference to his position on El Camino, that from where he was situated when looking across to Beverly Drive one cannot see the appellant's store.

At the trial a black .32 Colt revolver was introduced into evidence. It was found by police officers in a locked center drawer of appellant's desk at his store when officers took him there to search the premises. However, with reference to its identification as the weapon used by Greenburg in the robbery, the latter did not testify at the trial that it was the identical weapon. He went no further than to say, "This looks like the gun I received that morning." It would do violence to the record to say that the weapon was identified as one of the guns used in the robbery. In fact respondent's brief, in that connection, contains the concession, "Admittedly the gun in question was not *positively* identified as one of those used in the robbery."

In connection with the question of identification of the gun taken from the desk drawer at appellant's store, although the police officers knew they were going to find the gun in appellant's desk drawer, they did not have the same examined to ascertain whether or not there were any of the fingerprints of the accomplice Greenburg, the codefendant Gail Reingold, or appellant on the gun, They did take this precaution with reference to the .22 automatic allegedly used by the codefendant Miller in the robbery.

Respondent cites numerous cases in support of the claim that possession by a defendant of a weapon identified as *similar* to one used in the commission of a robbery has always been considered substantial evidence *connecting a defendant with the crime*. This is undoubtedly the law, but it is worthy of comment that in each of the cases cited by respondent, the appellant therein was *an actual participant* in the crime, and therefore, any weapon found in his possession, under his control, or near him would be proper to consider, whether similar or not. In the instant case, appellant was not an actual participant in the robbery and the burden rested upon the prosecution to inculpate him in the crime by connecting him with it through evidence sufficient to corroborate the testimony of the accomplice.

The insufficiency of the evidence that appellant possessed a *similar* gun to connect him with the crime lies in the fact that

in order to give such evidence any effect as tending in that direction, it seems from every angle necessary to interpret and explain this claimed ''corroboration'' in the light of the testimony of the accomplice Greenburg. His testimony is required to give it any direction to the alleged crime before it can be said to connect appellant with the commission thereof. This does not measure up to the requirements of the statute, which insists that testimony offered in corroboration of the testimony of an accomplice shall of itself tend to connect the defendant with the offense charged (*People* v. *Davis,* 210 Cal. 540, 554 [293 P. 32]; *People* v. *Shaw, supra,* p. 805, 808; *People* v. *Braun, supra,* p. 600).

When appellant's office manager Fred Slack was produced as a witness at the trial, he testified that he had never put the gun in the desk, had never seen it before as far as he knew, that he never had access to the drawers in the desk nor did he ever have a key to the same.

At the trial appellant admitted the weapon was his and that he had owned it for about 29 years. Concerning his statements made to the officers regarding the gun, appellant testified that at the time he was taken to his store and when the officers found the gun, ''I was in such a frame of mind from fright and nervousness, and I couldn't believe my eyes when they pulled the gun out of the drawer, I hadn't seen it for years, and I became very panicky and frightened, because I remembered that I told the officers that I didn't own a gun, and when I saw that gun I don't know what I said, I may have said anything.''

When interrogated as to whether appellant was nervous on the night in question, Police Sergeant Borders testified, ''Oh yes.''

As to the occurrences on the day now in question, appellant testified that he was the owner of 90 per cent of the stock of his jewelry corporation; that the business had no financial difficulties of any kind, and was very successful. That the corporation was the owner of a lease which was entered into some seven and one-half years prior to the trial and would not expire for eight years thereafter, that the rental for the store was $500 per month, and that the present appraised value of the leasehold shows a present rental value of $2,000 to $2,500 per month, making the value of the lease approximately $150,000 to $175,000. That on April 2, 1947, the date of the crime charged against him, appellant's business had a value of $350,000.

Appellant testified that he was arrested about 9:30 o'clock on the morning of June 17, 1947, while on his way from his home to his business. That he was taken to the Beverly Hills jail, where, according to his testimony, he was constantly accused of complicity in the crime of robbing Mrs. Genis, all of which it is conceded he steadfastly denied. That he was told his bail would be fixed at $100,000, that the chief of police said he was going to ruin appellant's business, that four or five uniformed officers would be placed in front of his store, that three or four more would be placed inside and no one would be allowed to come into the store. That the chief of police advised him that the stolen merchandise would be found in appellant's store, whereupon the latter offered to go with the chief to the store to search the same. That he was finger-printed and photographed, was accused of furnishing money and guns to the thugs who perpetrated the robbery of Mrs. Genis. That his many requests for permission to telephone his wife at home, his place of business and his attorney were denied. That he was given nothing to eat throughout the day. That he was taken to the "showup" room, where there were many bright lights and where he was compelled to mount a platform. That the chief of police then compelled him to "right face" and "left face."

It was following a day of such experiences that an officer approached appellant in his cell and "wanted to know if my proposition early in the morning that they didn't have to have a search warrant still held good, and could they come down to my place of business and search my store?" to which appellant replied, "Why, of course." Thereupon, appellant was taken to his store by the officers, where he unlocked the front door, directed the officers to his office and at their request unlocked the center drawer in his office desk, from which the officers extracted the .32 Colt automatic here in question.

As we view the situation surrounding the discovery of the gun, and statements to the officers in connection therewith, we are impressed that considerable force is given to appellant's claims that when questioned concerning his possession of a weapon he was suffering mental anguish, was highly nervous, and that his statements were motivated by distress of mind and fear, as he claims, rather than by consciousness of guilt as claimed by respondent, when it is remembered that in the course of the first conversation with appellant on the morning of his arrest the officers asked him if he kept a gun—an auto-

matic or a revolver—at his home or at his place of business, that when appellant replied that he did not, the officers told him it was not a violation of the law to possess a gun and asked if he desired to change his story and admit having a gun, to which he replied that he had no gun and had not possessed one for years. Also, when it is remembered that later in the day Police Sergeant Borders again asked appellant if he owned a gun, especially an automatic, telling him the police had information that he had left one for years in a desk drawer, to all of which appellant again replied that he had no gun. And finally, as the officers were taking appellant to his store and just as they were about to enter, they again questioned him about a gun, advising him they were going in to search the premises, that they were informed he had a gun in the drawer of his desk, and that if such was the case he had better tell them about it. But appellant replied, ''You won't find anything in there, particularly a gun.''

It challenges credulity, does some violence to reason, and does not conform to the usual propensities of people, that appellant, if in his normal senses, should insist that there was no gun in his desk, when, as he testified, he had kept a gun for many years. A reasonable interpretation under the facts here presented would tend to sustain appellant's claim that he was in a distraught state of mind, confused, upset and befuddled to the point that, as he testified, ''I don't know what I said, I may have said anything.''

It must be conceded that circumstances such as fright, possession of stolen property, false or misleading statements made to arresting officers or others with relation to material facts, for the purpose of misleading or warding off suspicion, may be received in evidence as indicating a consciousness of guilt, and may be considered as corroboration of an accomplice. But as to such circumstances, when utilized to corroborate the testimony of an accomplice, there must be present one very vital and essential element which is missing here. And that is that the circumstance relied upon, whatever it may be, must tend to connect the accused with the specific offense for which he is on trial. Therefore, in the instant case, unless the circumstances relied upon for ''corroboration'' furnish inculpatory evidence—that is, evidence tending to connect appellant with the specific crime involved, viz., the robbery of Mrs. Genis, it is not legal and sufficient corroboration.

In the case now under review, it is conceded that appellant did not personally participate as an actor in the robbery of

Mrs. Genis, and was absent from the scene of its perpetration. And, as heretofore pointed out, he could only be convicted on the ground that though not present he had previously advised and encouraged the robbery. There is no direct evidence, other than by the accomplice, that appellant knew the robbery was contemplated or that he knew on the morning of his arrest that a robbery had been committed, much less that he had previously advised and encouraged it. Though it be assumed that the false statements as to the ownership or possession of a gun tends strongly to show that appellant knew or at least suspected that the weapon had been used in the Genis robbery, such statements do not tend to show, though they might be regarded as creating a suspicion, that previous to the robbery he had advised and encouraged its commission. In the case at bar, the corroborating circumstances must tend immediately and directly to connect appellant with advising and encouraging the robbery of Mrs. Genis. The statements made by appellant relative to his possession or ownership of a gun are consistent with the supposition and conclusion that he only knew of the robbery, or of the use of the gun in the robbery, if it was so used, after the commission of the crime, or that he had received some of the jewelry taken in the robbery, knowing it had been stolen (*People* v. *Ciani, supra,* p. 603; *People* v. *Fagan, supra,* p. 234; *People* v. *Frank,* 132 Cal.App. 360, 372 [22 P.2d 792]).

However suspicious appellant's statements concerning the gun may be regarded, the cases are legion that suspicious circumstances and conduct are not sufficient to constitute corroborative testimony tending to connect an accused with the commission of the specific offense charged. The circumstances here relied upon concerning the gun do not of themselves, nor taken in conjunction with other corroborative circumstances, rise to the requirements of section 1111 of the Penal Code.

The next link in the claimed chain of corroborative circumstances has to do with an incident which occurred at appellant's store on the evening when the officers took him there to make a search of the premises. In this regard, Police Sergeant Borders testified that when they booked appellant at the Beverly Hills jail about 10:30 o'clock on the morning of his arrest, they asked him to empty his pockets, and that he took out one set of keys and other objects, which were placed on the desk; that after appellant had done this a further search was made of him and that another set of keys was found in his

lefthand trousers pocket; that Borders asked him about this second set of keys, as to what they were for, and he said they were for his business office, his store and his desk.

Sergeant Borders further testified that on the night when they went to the store with appellant they had his keys and property in their possession, and asked him for the key necessary to open the store, that appellant picked from his property the keys to enter the store; that this was the bunch of keys he had referred to as the second bunch of keys when they first searched him that day; that appellant opened the door to the store, and after he had done that and directed them to his private office, and after they found the drawer to the desk locked, that they asked appellant for the keys, that he answered that he had given them back to one of the officers, that they searched appellant and located the keys in his trousers pocket; that appellant then picked the key out of the bunch which opened his desk, and it was unlocked in his presence.

Much of what we have herein stated with reference to the circumstances surrounding the discovery of the gun is applicable to the key incident. Appellant took the keys to his desk out of his property package before leaving the jail and gave them to the officers. In his testimony he admitted he put the keys in his pocket but denies stating that he did not have the keys, and on the contrary testified that when the officers were unable to open the desk drawer with the chain of keys one of them had, that he reached into his pocket, took out the keys he had therein and opened the drawer. But assuming the correctness of the officers' testimony, what could appellant have expected to gain by keeping the keys in his pocket? Here was a wooden desk that Sergeant Borders testified could have been opened with a chisel, appellant had already admitted the officers to his store and had authorized them to search the same without a search warrant. We thoroughly agree with respondent's statement, "Admittedly this situation in itself is a very minor circumstance in the chain of corroboration," if it is even that. As we read the record in this regard, we are impressed that whether appellant put the keys in his pocket, believed he had turned them back to the officers, or that they were taken from his pocket, is highly immaterial, and certainly not corroborative of the testimony of the accomplice, and does not, even by way of suspicion, tend to connect appellant with advising and encouraging the commission of the specific offense charged against him. The connection with the offense required to be established by sec-

tion 1111 of the Penal Code cannot be accomplished by piling suspicious circumstance upon suspicious circumstance, nor by building up conjecture upon conjecture. While it is true, as contended by respondent, that the law does not require that the evidence necessary to corroborate the testimony of an accomplice shall tend to establish the precise facts testified to by the accomplice, it does require that such evidence must be held insufficient unless it tends to connect the accused with the specific crime for which he is on trial. And a veritable forest of cases are authority for the statement that the corroborating evidence is never sufficient if it merely creates a suspicion or even a grave suspicion. This because of the statutory presumption that one is innocent of crime. True, if from the proven circumstances the connection of a defendant with the crime charged may be fairly inferred, the corroboration is sufficient, but it must be remembered that an inference must be founded on a fact legally proved, and "such a deduction from that fact as is warranted by a consideration of the usual propensities or passions of men, the particular propensities or passions of the person whose act is in question, the course of business, or the course of nature." (Code Civ. Proc., § 1960.) And if in arriving at an indicated conclusion it is found necessary that one inference be made to depend upon a precedent inference, such a course of reasoning is not permitted by law (*Hamilton* v. *Pacific Elec. Ry. Co.,* 12 Cal. 2d 598, 601 [86 P.2d 829]).

The next circumstance relied upon by respondent as corroborative of the testimony of the accomplice is appellant's testimony that he had never seen his codefendant Miller until he saw him in the courtroom. In contradiction of this testimony, the prosecution presented testimony from a former secretary of the appellant that in November, 1930, the codefendant Miller came into the office of the appellant, giving the name of Harris, and asking to see appellant. That the former's presence in the office was made known to the latter, and in a few moments appellant called his secretary and instructed her to send the codefendant, then known as Harris, into appellant's office, which she did, that the codefendant Miller remained with the appellant some 10 minutes. Again, with praiseworthy frankness, the attorney general in his brief states of and concerning this testimony, "Our courts have more than once stated that mere acquaintanceship or mere association of a defendant with the actual perpetrator of a crime does not itself constitute legal corroboration. We admit

without question that it does not constitute sufficient corroboration. It is in the same category as appellant's knowledge of Mrs. Genis' possession of the big diamond ring and as his threat against her. These are but minor circumstances but they are piling up." To us it appears to be an attempt to pile up mere suspicion upon suspicion, inference upon inference, speculation upon speculation, and conjecture upon conjecture. As heretofore pointed out, what the law requires is evidence independent of the testimony of the accomplice which tends to connect the accused not simply with the perpetrators of the offense charged, but with the crime itself (*People* v. *Long, supra,* p. 33; 1 Encyc. of Evidence 107; *People* v. *Josephs,* 143 App.Div. 534 [128 N.Y.S. 257, 26 N.Y.Crim. 85]).

Respondent next urges what is termed, "One more incident, which ordinarily might be considered a minor bit of corroboration, but which in the present case and in conjunction with the other circumstances already mentioned, is, to say the least, highly illuminating. We refer to appellant's failure to produce his own brother as a witness."

Respondent urges that some degree of importance attaches to this "incident" because, in his motion for a separate trial, after his brother and codefendant Gail Reingold had pleaded guilty, appellant presented an affidavit sworn to by his said brother in which it was averred that the latter in conjunction with his codefendants Greenburg and Miller had alone planned and carried out the robbery without any participation or even knowledge thereof on the part of appellant, and that the latter was wholly innocent.

The foregoing affidavit and the averments therein contained were not before the jury. The affidavit was submitted to the court preceding the trial, and outside the presence of the jury. It is not contained in the reporter's transcript of proceedings had at the trial and is not reviewable on appeal. Whatever motives might have influenced counsel for appellant in not calling the latter's brother as a witness are not now before us. Suffice it to say that the jury knew nothing about the foregoing affidavit, were not entitled to know anything about it, and, therefore, it cannot properly be considered in relation to the question of corroboration of the accomplice.

Furthermore, the court in this case, as in all criminal cases, properly instructed the jury that "neither the prosecution nor the defense is required to call as witnesses all persons who are shown to have been present at any of

the events involved in the evidence, or who may appear to have some knowledge of the matters in question in this trial; . . . ."

 Concerning respondent's contention that since the decision in the case of *People* v. *Newland,* 15 Cal.2d 678 [104 P.2d 778], it is no longer the prerogative of a reviewing court to weigh the evidence and disturb the finding of the jury on the sufficiency of the corroborative evidence (citing *People* v. *Collier,* 111 Cal.App. 215, 227, 230 [295 P. 898]), it cannot be sustained. In determining the sufficiency of evidence to corroborate an accomplice, we are not confronted with a conflict in the evidence as to the guilt of the defendant, but the duty rests upon us to determine whether the corroborative evidence in its entirety does, in the language of the statute, tend to connect the defendant with the commission of the offense. And, as was said in *People* v. *Linde,* 131 Cal.App. 12, 15 [20 P.2d 704], "The difficulty of properly solving the problem is enhanced by reason of the fact that a reviewing court must, in the final analysis, place itself in the position of the triers of fact and weigh the evidence for the purpose of discovering whether it complies with the requirements of the statute."

A careful examination of the many cases involving the question of the legal sufficiency of the evidence presented as corroborative of the testimony of an accomplice, including the recent case of *People* v. *Trujillo,* 32 Cal.2d 105 [194 P.2d 681], will disclose that all the reviewing courts of this state necessarily have reviewed and weighed such evidence in order to determine whether or not the requirements of the statute have been complied with. In this connection, and illustrative of what we have in mind, we need refer only to the cases of *People* v. *Robbins,* 171 Cal. 466 [154 P. 317] ; *People* v. *Kempley,* 205 Cal. 441 [271 P. 478] ; *People* v. *Davis,* 210 Cal. 540 [293 P. 32] ; *People* v. *Shaw, supra*; *People* v. *Braun, supra.* In each of these, and many other cases, it will be noted that the court carefully considered and weighed each and all of the circumstances urged as constituting corroborative evidence for the purpose of determining whether or not they tended to connect the accused therein with the crime charged, and as to whether or not such circumstances measured up to the required *substantial* corroboration.

Time has not mellowed, nor have the decisions of the appellate tribunals of this state weakened the solicitude of

the courts that a person shall not be convicted on "suspicious circumstances" and that proof of mere suspicious circumstances and of opportunity to commit a crime are never sufficient to justify a conviction upon the testimony of an accomplice. As was so cogently stated in *People* v. *Robbins, supra,* page 470, "The rule in this behalf is well and tersely stated in 12 Cyc., at page 456, where it is said: 'It is necessary that the evidence corroborating an accomplice shall connect or tend to connect the defendant with the commission of the crime. Corroborative evidence is insufficient where it merely casts a grave suspicion upon the accused. It must not only show the commission of the offense and the circumstances thereof, but must also implicate the accused in it . . . But where the circumstances when proved, taken separately or collectively, are consistent with the innocence of the accused, there is no corroboration, and a verdict of conviction thereon will be set aside.' "

Upon a consideration of the entire record, which we have carefully read, we are forced to the conclusion that when the testimony of the accomplice is eliminated from the case, as it must be for the purpose of determining the question of corroboration (*People* v. *Robbins, supra; People* v. *Davis, supra; People* v. *Kempley, supra; People* v. *Braun, supra; People* v. *Shaw, supra*), the other evidence in the case falls far short of furnishing substantial proof that appellant either advised or encouraged the perpetration of the robbery here in question. Conceding that it arouses a suspicion, even a grave suspicion, that is insufficient to establish the corroboration required by the statute. In other words, the evidence herein is not the type of evidence which tends directly and immediately to connect appellant with the specific crime charged against him. In order to give it effect even as tending in that direction it seems that every point necessary to interpret and explain this "corroboration" in the light of the testimony of Greenburg requires his testimony to give direction to the crime charged, before it can be said to connect appellant with the commission thereof. An unbroken line of decisions in this state affirms the rule that the law requires that testimony offered in corroboration of the testimony of an accomplice shall *of itself* tend to *directly and immediately* connect an accused with the crime charged against him. As was said in *People* v. *Morton,* 139 Cal. 719, 724 [73 P. 609], quoting from *Childers* v. *State,* 52 Ga. 106, speaking of defendants convicted on the testimony of an accomplice,

"It may be these men are bad, guilty men, but if they are convicted, it ought to be under the rules of law. To justify this verdict would be, in our judgment, to make the best men in the land subject to the danger of conviction by any guilty scoundrel who might attack them."

In the case now engaging our attention, the accomplice, upon the witness stand, acknowledged his own infamy. He admitted that he "had a number of convictions," including a felony conviction in the State of New Jersey upon a charge of having brought a stolen automobile into that state, and another in the State of New York upon a charge of robbery. We do not make reference to these matters as supporting a conclusion that the testimony of the accomplice ought not to be believed by the jury, but simply by way of emphasizing the obligation resting upon us to critically examine other evidence in the record which it is claimed meets the standard of corroborative evidence required by section 1111 of the Penal Code. We do not question the right of the prosecution to present the testimony of an accomplice, notwithstanding that, as in the instant case, they dismissed two serious charges against him, namely, armed robbery, and kidnapping by force. However, in availing themselves of that right they must expect, as was said by this court in *People* v. *Braun, supra,* page 603, "the testimony of such a witness to be viewed in the light of the reward extended him, insofar as the motives arising therefrom might prompt him in the giving of his testimony."

Strikingly applicable to the case now engaging our attention do we find the further language used by this court in *People* v. *Braun, supra,* page 603: "Whether guilty or innocent, the appellant was entitled to have his case fairly tried according to the established rules of law, and as said by a learned judge, 'Though unfair means may happen to result in doing justice to the prisoner in the particular case, yet justice so attained is unjust and dangerous to the whole community.' (*Hurd* v. *People*, 25 Mich. 405.) The doctrine that respect for the law cannot be inspired by withholding the protection of the law is one which recognizes no exceptions.

"Illegitimate and unconstitutional practices get their first footing by silent approaches and slight deviations from established legal modes of procedure. In a strong dissenting opinion delivered by Mr. Justice Sutherland of the Supreme Court of the United States, in *Associated Press* v. *National Labor Relations Board,* 301 U.S. 103 [57 S.Ct. 650, 81 L.Ed. 953], we

are counseled to 'withstand all beginnings of encroachment. For the saddest epitaph which can be carved in memory of a vanished liberty is that it was lost because its possessors failed to stretch forth a saving hand while yet there was time.' The acquittal of a guilty person is truly a miscarriage of justice, but the conviction of an innocent person through relaxation of those fundamental legal principles such as the one with which we are here concerned, would be a tragedy. It is the duty of the courts to be watchful for the constitutional and individual rights of the citizen and protect against any stealthy encroachments thereon.''

While the foregoing conclusion at which we have arrived concerning the legal insufficiency of the evidence relied upon to corroborate the testimony of the accomplice Greenburg requires a reversal, we are disposed to give consideration to appellant's second ground for a reversal for the guidance of the trial court in the event of a retrial of this cause.

It is appellant's contention that the trial court erred in permitting one alleged accusatory statement to remain in the record, and in failing to instruct the jury as to the weight and effect of accusatory statements as requested by appellant. Insofar as the particular statement is concerned, the record reflects that it was made to the chief of police on the day appellant was arrested and following the previous conversations wherein appellant had unequivocally and emphatically denied to the chief any connection with or participation in the Genis robbery.

It appears from the record that during the trial considerable testimony was offered through Detective Sergeant Borders and Chief Anderson of the Beverly Hills Police Department as to conversations had with appellant subsequent to his arrest, and which it was the claim of the prosecution constituted what are known as accusatory statements. Timely objections were made by appellant in each instance and all were overruled. As the trial was drawing to a close and just prior to the commencement of arguments to the jury, the court, on motion of appellant, struck all this testimony from the record save and except one conversation. The particular testimony which was permitted to remain in the record is as follows:

''Q. By Mr. Henderson (Deputy District Attorney): When you and Moe were alone in your office, Chief, what did you say to him and what did Moe say to you?

"A. I said that I was very disappointed that a man of his caliber would be involved in a vicious crime like this one here. I stated he should be ashamed of himself; he had the most prominent corner in the city of Beverly Hills; he had a wonderful home in the north part of the city, and for him to be a part of such a crime was a disgrace to him and to the jewelry profession, or business; that he had been a headache for years as far as I was concerned.

"Mr. Giesler: I move to strike that as not within the issues, 'as far as I am concerned, he has been a headache for years.'

"The Court: I think it is part and parcel of the conversation and tends to shed some light as to the nature of the conversation and part of the attendant circumstances. The motion to strike is denied.

"A. (Continuing.) I asked him why didn't he admit the offense, get the jewelry back, as I had the information of the entire crime, how it was committed; that I had been in New York City, I talked to a person who was familiar with it, and I related the facts that I had regarding the crime.

"Q. By Mr. Henderson: What did Mr. Reingold say?

"A. He said, 'What do you think I am—some punk?' He says, 'You are talking to a businessman.' He said, 'You can't talk that way to me.' He gave me quite a bit of an argument; the substance of it was that who was I, the chief of police to question a man of his standing in the community."

The order striking the testimony that was eventually barred from the record was made upon the ground that since the appellant had consistently denied the accusations when first made he was not called upon to deny them continuously and repetitiously thereafter. The stricken evidence was recognized by the trial court as being inadmissible under the holding in *People* v. *Simmons*, 28 Cal.2d 699 [172 P.2d 18] ; and *People* v. *Spencer*, 78 Cal.App.2d 652 [178 P.2d 520]. In ruling that the foregoing conversation was admissible, the court stated, with reference to it: "Well, I think we have an accusation here as to being involved, and a response on page 311, which is an equivocal response and not a denial; that relates to being involved and doesn't involve the proposition of 'fingering' the job and so forth. I still think that should remain in." It is therefore manifest that the trial court regarded the statement as an accusatory one, and so designated it. Appellant having consistently denied any involvement in the crime when previously questioned by both Chief Anderson and Sergeant Borders, the

surrounding circumstances in connection with the testimony now under consideration were not such as to render the evidence admissible. (*People* v. *Simmons, supra*; *People* v. *Spencer, supra.*)

Appellant offered several instructions correctly embodying the law as to the limited purposes for which evidence of accusatory statements are receivable in evidence. Each of these proffered instructions was refused by the court on the stated ground, "Accusatory statement stricken from record before arguments," and, "such evidence was stricken from the record." Such refused instructions were vital to the proper consideration of the evidence by the jury and should have been given in view of the ruling of the court permitting the one accusatory statement to remain in the record.

Any doubt as to the prejudicial effect of the court's ruling admitting into evidence as an accusatory statement the testimony above quoted is at once removed when consideration is given to the use to which such evidence was put by the deputy district attorney in his argument to the jury. From the closing argument of the prosecutor to the jury, we quote the following:

"You know, if we were to convict Greenburg and if we were to convict Miller and the higher ups went free, what have we accomplished? *The Millers and the Greenburgs are the 'punks' as described to you by Moe Reingold. The 'punks' roam this country. They can be bought for a dime a dozen; but when you get one higher up, one who is the brains of the outfit, you have destroyed a large number of these 'punks', because they cannot dispose of the proceeds of their robbery,* and they don't know the source of the valuable jewels, they don't know the persons who have them and where they have them or when they have them.

"We speak very often of the 'rich man's justice', and the 'poor man's justice'. Very often when we convict the so-called 'punk', people say, 'What have they done? They have convicted the underdog, the poor muscle man, the man who commits the crime, but the brains of the outfit, the man with the money still roams free'. Oh, we hear that kind of criticism time and time again. And so it happens that once in a great while we are fortunate enough to bring you the brains of the outfit, the monied man, the higher up. It does not happen very often but once in a while we are fortunate to have some evidence to present to you.

"I will not stultify myself and I will not insult your intelligence by telling you that the evidence against the defendant

Moe Reingold is overwhelming. It is not overwhelming; but at the same time it is far more than we usually can get against the brains of the outfit, and that is necessarily so. *The punk, the muscle man* goes out to commit a crime and he exposes himself; he is in full view of the victim. As a result the victim can identify that punk, that muscle man, but the brains of the outfit, who deals with his lieutenant, never exposes himself even to a muscle man, and certainly not to the victim. *And so of necessity you can never get the same quantity of evidence against the brains, the higher up, that you do against the muscle man, the punk.*

"But even though the quantity of evidence is not the same as you have against that muscle man, yet the type, the character, the quality of the evidence is such that you decent American jurors can say, 'We are convinced beyond a reasonable doubt that that monied man, that brains, that higher up is guilty.'" (Emphasis added.)

Had the challenged testimony been eliminated from the record as it should have been, the deputy district attorney could not have used it as he did with its obvious irreparable and damaging effect to appellant.

In fairness to the trial judge, it should be noted that following his ruling by which testimony as to accusatory statements was stricken from the record, he stated to counsel outside the presence of the jury, "I think the subject matter intended to be stricken here is covered pretty well in what has transpired here in the courtroom. If there appears in the record remaining any testimony in regard to an accusation, accusing Mr. Reingold of this crime, it will be understood by counsel that that matter has been stricken and is stricken from the record and is not to be argued, and I think neither side will argue it."

When the jury was returned into court, the trial judge instructed them as follows:

"During the period you have been up in the jury room, court has been in session and certain portions of the testimony have been stricken from the record.

"Included in the testimony of Chief of Police Anderson and Sergeant Borders of the Beverly Hills Police Department as to several conversations had with the defendant Maurice Reingold, was testimony of a statement accusing the defendant Reingold of having 'fingered', planned and arranged or having been implicated in the robbery which is charged in the indictment, and the testimony of these officers to the effect that upon the first making of this accusation it was denied by

the defendant Reingold, and that when in another conversation which was had soon after the accusation was repeated defendant made no verbal response, the jury is advised that the testimony as to these accusations has been entirely stricken from the record and from the testimony in this case, and the jury is now instructed to put the testimony so stricken entirely out of their consideration, to entirely disregard it and not to consider it for any purpose whatsoever.''

Undoubtedly, this instruction would have effectively protected appellant's rights had not the one foregoing accusatory statement remained in the record, which afforded the prosecutor an opportunity to comment thereon, as heretofore narrated, to the manifest prejudice of appellant.

We deem it unnecessary to consider appellant's final contention that the court abused its discretion in refusing to grant him a trial separate and apart from his codefendants. This we say because it appears from the record that the indictment has been dismissed as to defendant Greenburg, defendant Miller was found guilty as to count I, and count II was dismissed as to him and defendant Gail Reingold, the latter having pleaded guilty to count I. Thus, if a retrial ensues, appellant will be the sole remaining defendant.

For the reasons herein stated, the attempted appeals from the guilty verdict and the verdict finding that at the time of the offense appellant was armed with a deadly weapon are dismissed. The judgment and the order denying appellant Maurice Monte Reingold's motion for a new trial are, and each is, reversed, and the cause remanded for a new trial.

York, P. J., and Doran, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied September 30, 1948. Shenk, J., Edmonds, J., and Spence, J., voted for a hearing.